[Nos. 68048-0-I; 68049-8-I.   Division One.   January 7, 2013.]

THE TOWN OF WOODWAY ET AL., *Respondents*, v. SNOHOMISH COUNTY ET AL., *Appellants*.

*Mark R. Johnsen, Douglas A. Luetjen,* and *Gary D. Huff* (of *Karr Tuttle Campbell*) and *Mark K. Roe, Prosecuting Attorney,* and *John R. Moffat, Martin D. Rollins,* and *Matthew A. Otten, Deputies,* for appellants.

*Wayne D. Tanaka* (of *Ogden Murphy Wallace*) and *Zachary R. Hiatt* (of *Graham & Dunn PC*), for respondents.

*Julie S. Nichols* on behalf of Building Industry Association of Washington, amicus curiae.

¶1  LAU, J. — Under the Growth Management Act (GMA), chapter 36.70A RCW, a landowner's development permit application vests to a local jurisdiction's land use comprehensive plan provisions and development regulations at the time a complete application is filed, despite a Growth Management Hearings Board's (Growth Board) later determination that the local jurisdiction did not fully comply with the State Environmental Policy Act's (SEPA), chapter 43.21C RCW, procedural requirements in its enactment of those plan provisions and regulations. Because BSRE Point Wells LP filed complete development permit applications before the Growth Board issued its final decision and order, those applications vested to Snohomish County's urban center ordinances. We reverse the trial court's summary judgment order granting declaratory and injunctive relief in favor of the Town of Woodway and Save Richmond Beach Inc. (SRB) and remand for entry of an order dismissing this lawsuit on Snohomish County's and BSRE's summary judgment motions.

## FACTS AND PROCEDURAL HISTORY

¶2  The parties agree this appeal raises questions of law and not fact.[1] BSRE owns a 61-acre site on Puget Sound known as Point Wells. The site is located in unincorporated Snohomish County, just north of the King County-Snohomish County border. Because Puget Sound lies to the west and steep bluffs rise to the east, ingress is limited to a two-lane road running through the city of Shoreline's Richmond Beach neighborhood in King County and then through Woodway in Snohomish County. The road dead-ends at Point Wells. The nearest highway, State Route 99, lies approximately two and one-half miles to the east.

---

[1] Because this appeal presents pure legal questions, our review is de novo. CR 56(c); *Blue Diamond Grp., Inc. v. KB Seattle 1, Inc.*, 163 Wn. App. 449, 453-54, 266 P.3d 881 (2011); *Mathioudakis v. Fleming*, 140 Wn. App. 247, 252, 161 P.3d 451 (2007).

¶3 During the last century, Point Wells accommodated a petroleum terminal, a tank farm, and an asphalt plant. In 2007, BSRE sought a redesignation of the Point Wells site on the Snohomish County (County) comprehensive plan map from an industrial designation to one that would allow it to redevelop the site with residential and commercial uses. The county council granted that request in two separate actions in 2009 and 2010. Under the authority of the GMA, it adopted ordinances redesignating the Point Wells site as an "urban center" on the County's comprehensive plan map in 2009. Neighboring jurisdictions Woodway and the city of Shoreline, together with neighborhood group SRB, petitioned for review of the comprehensive plan amendments and the adequacy of the County's SEPA review before the Growth Board.[2]

¶4 Meanwhile, the county council in 2010 rezoned Point Wells to an "urban center" zone and adopted development regulations accommodating mixed-use development at the site.[3] Environmental review of the development regulations consisted of a determination of nonsignificance based on the final supplemental environmental impact statement used to support the 2009 comprehensive plan amendments. Woodway, Shoreline, and SRB also petitioned for review of the development regulations.[4] The Growth Board consolidated the petitions, and BSRE intervened. All parties appeared at a hearing on the merits.

¶5 Following the Growth Board hearing, but before it issued its final decision and order, BSRE applied to the County for several development permits. On February 14, 2011, it filed a master permit application for a preliminary short plat (subdivision) and a land disturbing activity permit. On February 20, 2011, the County published a

---

[2] The petitions were consolidated as Growth Management Hearings Board case 09-3-0013c *Shoreline III.*

[3] Snohomish County amended ordinances 09-079 and 09-080.

[4] The petitions were consolidated as Growth Board case 10-3-0011c *Shoreline IV.*

notice indicating that BSRE had filed a completed subdivision application. In addition, on March 4, 2011, BSRE filed a master permit application for a shoreline management substantial development permit, an urban center development permit, a site (development) plan, a land disturbing activity permit, and a commercial building permit. On March 13, 2011, the County published a second notice indicating BSRE had filed completed applications for the shoreline substantial development permit, the urban center development permit, the site plan, and the commercial building permit.

¶6 On April 25, 2011, the Growth Board issued a final decision and order,[5] ruling that the County's challenged enactments were adopted partly in violation of the GMA and partly in violation of SEPA. The Growth Board also found the challenged comprehensive plan provisions, but not the development regulations, invalid under the GMA.[6] The Growth Board remanded to the County, directing it to bring its comprehensive plan amendments into compliance with the GMA and SEPA. As to the regulations, the Growth Board found them noncompliant with SEPA and remanded for remedial action.

¶7 On September 12, 2011, Woodway and SRB[7] filed a complaint in superior court, seeking (1) a declaration that BSRE's development permit applications had not vested to the County's urban center designation or development regulations in effect at the time of filing and (2) an injunction barring the County from processing BSRE's development permit applications until the County achieved

---

[5] The Growth Board issued a corrected final decision and order on May 17, 2011, that remedied clerical errors.

[6] Woodway and SRB had argued for invalidation of both the comprehensive plan provisions and the development regulations.

[7] Although a copetitioner in the Growth Board appeal, Shoreline is not a party to this appeal. We note that Shoreline was the only party that argued to the Growth Board that the County's enactments violated SEPA. Woodway never raised SEPA before the Growth Board, and SRB's SEPA challenge was dismissed for lack of standing.

GMA and/or SEPA compliance on all remanded ordinances, as directed by the Growth Board's final decision and order. Woodway and SRB moved for summary judgment, seeking the relief requested in the complaint. The County and BSRE separately moved for summary judgment, requesting dismissal of the complaint.

¶8 After oral argument, the trial court granted Woodway and SRB's summary judgment motion and denied the County's and BSRE's motions. The court concluded that "BSRE is not vested to the Snohomish County ordinances in effect at the time BSRE made application for the urban center permits." It also issued an injunction preventing the County from processing BSRE's development permit applications until the County complied with the Growth Board's final decision and order. We consolidated appeals by the County and BSRE.

## ANALYSIS

¶9 The dispositive question is whether, under the GMA, a landowner's development permit application vests to a local jurisdiction's land use comprehensive plan provisions and development regulations at the time a complete application is filed, despite a Growth Board's subsequent determination that the jurisdiction did not fully comply with SEPA's procedural requirements in its enactment of those plan provisions and regulations.[8]

¶10 The County and BSRE argue that BSRE had a vested right to have its development permit applications processed under the urban center designation and develop-

---

[8] At oral argument in this court, Woodway formulated the issue as follows:

"And the legal question is whether or not if they filed to a void ordinance, can you vest? That's the legal question that we think has been answered by those pre-GMA cases that were not overruled by [RCW 36.70A].302 or .300(4). That is our position. If you find that .302 or .200—or .300—overruled all of those cases, I guess we lose." Wash. Court of Appeals oral argument, *Town of Woodway v. Snohomish County*, No. 68048-0-I, (Nov. 7, 2012), at 1 hr., 30 min., 57 sec. (on file with court).

ment regulations in effect at the time of filing. Woodway and SRB argue BSRE acquired no vested rights because SEPA noncompliance renders the County's urban center ordinances ultra vires and/or void and thereby incapable of supporting vested rights. To fully understand the parties' various claims, we first discuss the vested rights doctrine and the development of the GMA.

*Vested Rights Doctrine*

■■ ¶11 "Washington's vested rights doctrine, as it was originally judicially recognized, entitles developers to have a land development proposal processed under the regulations in effect at the time a complete building permit application is filed, regardless of subsequent changes in zoning or other land use regulations." *Abbey Rd. Grp., LLC v. City of Bonney Lake*, 167 Wn.2d 242, 250, 218 P.3d 180 (2009) (citing *Hull v. Hunt*, 53 Wn.2d 125, 130, 331 P.2d 856 (1958)). "Vesting 'fixes' the rules that will govern the land development regardless of later changes in zoning or other land use regulations." *Weyerhaeuser v. Pierce County*, 95 Wn. App. 883, 891, 976 P.2d 1279 (1999).

> Washington's rule is the minority rule, and it offers more protection of development rights than the rule generally applied in other jurisdictions. The majority rule provides that development is not immune from subsequently adopted regulations until a building permit has been obtained *and* substantial development has occurred in reliance on the permit. Our cases rejected this reliance-based rule, instead embracing a vesting principle that places greater emphasis on certainty and predictability in land use regulations. By promoting a date certain vesting point, our doctrine ensures that "new land-use ordinances do not unduly oppress development rights, thereby denying a property owner's right to due process under the law." *Valley View Indus. Park v. City of Redmond*, 107 Wn.2d 621, 637, 733 P.2d 182 (1987). Our vested rights cases thus recognize a "date certain" standard that satisfies due process requirements.

*Abbey Rd. Grp.*, 167 Wn.2d at 250-51.

¶12 Naturally, our "liberal" vesting rule comes at a price. *Graham Neighborhood Ass'n v. F.G. Assocs.*, 162 Wn. App. 98, 115, 252 P.3d 898 (2011). Our Supreme Court has acknowledged that vesting implicates a delicate balancing of interests. *Erickson & Assocs. v. McLerran*, 123 Wn.2d 864, 873-74, 872 P.2d 1090 (1994) ("The practical effect of recognizing a vested right is to sanction the creation of a new nonconforming use. . . . If a vested right is too easily granted, the public interest is subverted.").

¶13 By statute, development rights vest upon the filing of a "valid and fully complete building permit application." RCW 19.27.095(1); *Abbey Rd. Grp.*, 167 Wn.2d at 246. The vested rights doctrine also applies to subdivision applications[9] and shoreline substantial development permit applications.[10] The parties agree that before the Growth Board issued its final decision and order, BSRE had filed complete development permit applications.[11]

### Development of the GMA[12]

¶14 The GMA is Washington's fundamental land use planning law. Before its enactment, local land use planning was optional. *See* Richard L. Settle & Charles G. Gavigan, *The Growth Management Revolution in Washington: Past, Present, and Future*, 16 U. PUGET SOUND L. REV. 867, 876 (1993). In the 1980s, public concern mounted over rapid population growth and increasing development pressures within the state. *See King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 142 Wn.2d 543, 546, 14 P.3d

---

[9] By statute, "a proposed division of land must be 'considered under the subdivision or short subdivision ordinance, and zoning or other land use control ordinances' in effect at the time that the fully completed application is submitted." *Graham*, 162 Wn. App. at 115 (quoting RCW 58.17.033(1)).

[10] *Talbot v. Gray*, 11 Wn. App. 807, 811, 525 P.2d 801 (1974).

[11] The County determined that BSRE's development permit applications were complete and therefore vested.

[12] The GMA's comprehensive legislative history leaves no doubt the legislature created no "loophole" to be filled in by the common law.

133 (2000). Adopted by the legislature in 1990, the GMA responded to these concerns by, among other things, requiring the state's fastest-growing counties to adopt comprehensive growth management plans[13] and development regulations[14] to implement those plans.[15]

■ ¶15 In 1991, the legislature amended the GMA to establish an administrative review process to address the GMA's lack of administrative enforcement mechanism. *Skagit Surveyors & Eng'rs, LLC v. Friends of Skagit County*, 135 Wn.2d 542, 548, 958 P.2d 962 (1998). It adopted provisions, among others, to allow administrative appeals of comprehensive plan provisions and development regulations to the Growth Board.[16] It also provided the Growth Board with authority to review petitions alleging that a comprehensive plan provision or development regulation was adopted not only in violation of the GMA's requirements but also of SEPA. RCW 36.70A.280(1).

■■ ¶16 Under the current formulation of the statute, if a petitioner challenges a comprehensive plan provision or

---

[13] The comprehensive plan is the generalized coordinated land use policy statement adopted by a jurisdiction that will be used to guide its land use decisions well into the future. It has been described as a "blueprint" or "guide" for all future development. *Barrie v. Kitsap County*, 93 Wn.2d 843, 849, 613 P.2d 1148 (1980).

[14] Development regulations are the controls placed on development or land use activities by a county or city. They must be consistent with and implement the comprehensive plan. RCW 36.70A.040.

[15] In general, the GMA promotes a decentralized approach to growth management. " 'Local governments have broad discretion in developing [comprehensive plans] and [development regulations] tailored to local circumstances.' " *King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 142 Wn.2d 543, 561, 14 P.3d 133 (2000) (alterations in original) (quoting *Diehl v. Mason County*, 94 Wn. App. 645, 651, 972 P.2d 543 (1999)). But such discretion is bounded by the GMA's enumerated planning goals, which were created and must be used "exclusively for the purpose of guiding the development of comprehensive plans and development regulations." RCW 36.70A.020.

[16] Originally, the GMA provided for three independent Growth Management Hearings Boards with regional authority in Eastern Washington, Western Washington, and Central Puget Sound, respectively. *See Skagit Surveyors*, 135 Wn.2d at 548. In 2010, the legislature consolidated the regional growth boards into a statewide Growth Management Hearings Board. LAWS OF 2010, ch. 211, § 4.

development regulation, the Growth Board, after a hearing, must issue a final order "based exclusively" on whether the state agency, county, or city is "in compliance" or "not in compliance" with the requirements of the GMA, SEPA, or the Shoreline Management Act of 1971 (SMA), ch. 90.58 RCW. RCW 36.70A.300(1), (3). Comprehensive plan provisions and development regulations are "presumed valid upon adoption," and the Growth Board must make a finding of compliance "unless it determines that the action by the state agency, county, or city is clearly erroneous in view of the entire record before the [Growth B]oard and in light of the goals and requirements of [the GMA]." RCW 36.70A.320(1), (3). If the Growth Board makes a finding of noncompliance, it must remand the plan or regulation to allow the affected jurisdiction to achieve compliance. RCW 36.70A.300(3)(b).

## The 1995 GMA Amendments

¶17 In 1994, the Governor's Task Force on Regulatory Reform (Task Force)[17] issued a report that served as the basis for landmark land use legislation during the 1995 legislative session. A portion of that report highlighted "a new legal issue"—the vested rights status of filed development permit applications during the pendency of an administrative appeal to the Growth Board. The Task Force observed:

> The adoption of the GMA has created a new legal issue that several members of the local government, development, and environmental community believe must be resolved. Under the GMA, a local government's development regulations must be consistent with its comprehensive plan. If a comprehensive plan is declared invalid, or if a development regulation is found to be inconsistent with the plan, the validity of any permits issued by the local government under the authority of those development regulations will be called into question.

---

[17] The Task Force was established in 1993 by executive order 93-06.

Because there are many different circumstances in which this issue may arise, it is not possible to develop a single principle which would apply in all cases. Therefore, the Task Force is recommending giving the Growth Management Hearings Boards discretion to make the determination on a case-by-case basis. The presumption should be that the plan or regulation will remain in effect unless the Board determines this would violate the policy of the GMA.

WASH. STATE OFFICE OF FIN. MGMT., GOVERNOR'S TASK FORCE ON REGULATORY REFORM: FINAL REPORT 52 (Dec. 20, 1994) (FINAL REPORT) (italics omitted). The Task Force recommended that

a comprehensive plan or development regulation which is found to be invalid should remain in effect, unless the Growth Management Hearings Board determines that continued enforcement of the plan would violate the policy of the GMA. The Board should make appropriate findings and conclusions to support this determination and should limit the effect of its determination to those portions of the plan or regulation that violate the policy of the GMA.

FINAL REPORT, *supra*, at 52.

¶18 In response to the Task Force report, the legislature in 1995 adopted regulatory reform legislation broadly integrating growth management planning and environmental review. LAWS OF 1995, ch. 347, § 1. This legislation amended the GMA, SEPA, and the SMA. LAWS OF 1995, ch. 347, Parts I-III. It also adopted new chapters imposing regulatory reform on project permit processing, chapter 36.70B RCW, and providing for a new method of appealing local land use permit decisions—the Land Use Petition Act, chapter 36.70C RCW.

¶19 On the question of what happens to vested rights when a development permit application is filed pending a Growth Board appeal, the legislature responded by amending the GMA to authorize a determination of invalidity by the Growth Board. *Skagit Surveyors*, 135 Wn.2d at 561-62. It left intact the developer's ability to vest development permit applications while any appeal of the

challenged enactment remained pending. If the Growth Board found a comprehensive plan provision or development regulation noncompliant with the GMA or SEPA and the noncompliance substantially interfered with the fulfillment of the GMA's goals, the Growth Board could issue a determination of invalidity as to the challenged comprehensive plan provision or development regulation. Under that determination, no development permit applications could vest from the date of the Growth Board's invalidity order until the county or city adopted compliant legislation.

¶20 As enacted, the amendment stated:

(2) A finding of noncompliance and an order of remand shall not affect the validity of comprehensive plans and development regulations during the period of remand, unless the board's final order also:

(a) Includes a determination, supported by findings of fact and conclusions of law, that the continued validity of the plan or regulation would substantially interfere with the fulfillment of the goals of this chapter; and

(b) Specifies the particular part or parts of the plan or regulation that are determined to be invalid, and the reasons for their invalidity.

(3) *A determination of invalidity* shall:

(a) Be prospective in effect and *shall not extinguish rights that vested under state or local law before the date of the board's order*; and

(b) Subject any development application that would otherwise vest after the date of the board's order to the local ordinance or resolution that both is enacted in response to the order of remand and determined by the board pursuant to RCW 36.70A.330 to comply with the requirements of this chapter.

LAWS OF 1995, ch. 347, § 110 (some emphasis omitted). This amendment simplified the GMA review process by providing the Growth Board "two distinct alternatives" to address noncompliant comprehensive plans and development regulations: (1) make a finding of noncompliance or (2) enter a determination of invalidity. *King County v. Cent.*

*Puget Sound Growth Mgmt. Hearings Bd.*, 138 Wn.2d 161, 181, 979 P.2d 374 (1999).

*The 1997 GMA Amendments*

¶21 Even with the enactment of the 1995 invalidity provision, the legislature remained concerned about the impact of allowing development permit applications to vest to comprehensive plan provisions and development regula- tions during appeal. It ordered the 14-member Land Use Study Commission, originally created by the 1995 legisla- tion,[18] to further study that issue:

The commission shall:

. . . .

(4) Monitor instances state-wide of the vesting of project permit applications during the period that an appeal is pending before a growth management hearings board, as authorized under RCW 36.70A.300. The commission shall also review the extent to which such vesting results in the approval of projects that are inconsistent with a comprehensive plan or develop- ment regulation provision ultimately found to be in compliance with a board's order or remand. The commission shall analyze the impact of such approvals on ensuring the attainment of the goals and policies of chapter 36.70A RCW, and make recom- mendations to the governor and the legislature on statutory changes to address any adverse impacts from the provisions of RCW 36.70A.300. The commission shall provide an initial report on its findings and recommendations by November 1, 1995, and submit its further findings and recommendations subsequently in the reports required under section 803 of this act.

LAWS OF 1995, ch. 347, § 804. The commission was also directed to submit annual reports to the legislature and governor stating its findings, conclusions, and recommendations.

---

[18] Laws of 1995, chapter 347, section 801 charged the commission to "integrat[e] and consolidat[e] . . . the state's land use and environmental laws into a single manageable statute."

¶22 The commission made the following finding and recommendation regarding invalidity:

> Since their creation, the Boards have had the authority to determine that plans or regulations do not comply with the GMA. This authority led to concerns about the effect of a decision of non-compliance on permit applications and projects that are dependent upon those plans or regulations. The Legislature sought to clarify this impact in 1995 by providing that a determination of noncompliance did not apply to permits unless the Board made a specific finding that the plan or regulation was invalid. This order only applies to permits filed after the date of the Board's order. Those projects are subject to the plan or regulations determined by the Board as complying with the GMA. The Boards have issued approximately 10 invalidity orders since the authority was granted to them.
>
> The exercise of this authority has proven to be a potent tool for encouraging compliance with the GMA. However, it has also proven to be a focus for complaints that the Boards are undermining the original purpose of the GMA that local elected officials should make the planning decisions for their communities. The options considered by the Commission to address this authority ranged from eliminating the authority, to allowing projects to be reviewed under the goals and policies of the GMA until a new plan or development regulations are approved, to clarifying the types of permits affected and not affected by the order.

WASH. LAND USE STUDY COMM'N, 1996 ANNUAL REPORT § VI.B(2) (Jan. 14, 1997) (ANNUAL REPORT). Despite the legislature's concern, the commission recommended no changes that would weaken protections for vested rights. Instead, it recommended

> the authority to invalidate comprehensive plans should remain with the Boards. *[The commission] is recommending changes that clarify that projects that vested prior to the determination are not affected by the order*, exempt some types of permits from the effect of a determination of invalidity, and clarify the options available to a local government to have an order lifted.

ANNUAL REPORT, *supra*, § VI.B(2) (emphasis added).

¶23 The 1997 legislature recodified the GMA's invalidity provision in a new, stand-alone section, RCW 36.70A.302. LAWS OF 1997, ch. 429, § 16. The legislature retained the grounds for finding invalidity (substantial interference with the fulfillment of the GMA goals) in subsection (1) of new section .302. The vested rights provision adopted by the 1995 legislature was moved, with little change, to the first sentence of subsection (2). Then, responding to the commission's 1996 recommendation that it clarify with even greater emphasis that "projects that vested prior to the determination [of invalidity] are not affected by the order," the legislature added a second sentence to the vesting provision in subsection (2). ANNUAL REPORT, *supra*, § VI.B(2). In full, subsection (2) states:

> A determination of invalidity is prospective in effect and does not extinguish rights that vested under state or local law before receipt of the board's order by the city or county. The determination of invalidity does not apply to a completed development permit application for a project that vested under state or local law before receipt of the board's order by the county or city or to related construction permits for that project.

RCW 36.70A.302(2). The commission issued a final report on December 30, 1998, which included a "Study of the Impact of Vesting During GMHB Appeals." WASH. LAND USE STUDY COMM'N, FINAL REPORT, ch. 14. The 1997 invalidity provision remains unchanged to this day.

¶24 Relying on the GMA's legislative history and the invalidity provision's plain text, the County and BSRE argue that "because BSRE's development permit applications were filed prior to the issuance of the Growth Board's [final decision and order], they are vested to the County's urban center ordinances." Snohomish County's Opening Br. at 9 (boldface and formatting omitted). Woodway and SRB respond, arguing principally that

> [u]nder the GMA, "invalidity" only relates to ordinances found to substantially interfere with the GMA goals.

Accordingly, there exists a certain class of cases, of which this case is one, where a procedural violation of SEPA does not result in a violation of the GMA goals. In those particular instances, the prospective invalidity provisions of RCW 36.70A.302(2) do not apply. Instead, the pre-Regulatory Reform rule that vested rights cannot be obtained in an invalid ordinance applies and prevails.

Woodway's Resp. Br. at 20. In essence, Woodway and SRB contend that the County's development regulations are void and the legislature left a "loophole" to be filled in by the common law.[19]

■■ ■■ ¶25 We conclude that RCW 36.70A.302(2)'s invalidity provision controls the present dispute. It unambiguously[20] describes what happens to development permit applications that are filed with counties and municipalities relying on recently adopted GMA enactments—comprehensive plan provisions and development regulations—that are challenged in a growth board administrative appeal. As quoted above, RCW 36.70A.302(2)[21] states that those complete and filed applications vest to those challenged plan provisions and regulations, regardless of the Growth Board's subsequent ruling in the administrative appeal. The legislature made clear that the Growth Board may declare a local enactment invalid *only* when that enactment substantially interferes with the fulfillment of the GMA's goals. A violation of SEPA alone is not a sufficient ground

---

[19] At the trial court, Woodway and SRB acknowledged that the GMA's invalidity provision disallowed a determination of invalidity premised on a violation of SEPA alone. They claimed this was a "loophole" that required judicial backfill.

[20] Woodway and SRB do not contend this provision is ambiguous.

[21] In determining whether a statute conveys a plain meaning, "that meaning is discerned from all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question." *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 11, 43 P.3d 4 (2002). "If the statute's meaning is plain on its face, we give effect to that plain meaning as the expression of what was intended." *TracFone Wireless, Inc. v. Dep't of Revenue*, 170 Wn.2d 273, 281, 242 P.3d 810 (2010).

for invalidity.[22] Here, the Growth Board determined that the County's urban center development regulations violated no GMA requirements. The Growth Board instead concluded the regulations violated only SEPA's procedural rules.[23] Accordingly, the Growth Board did not invalidate the regulations. Therefore, those regulations remain valid.

¶26 In addition to specifying the conditions under which the Growth Board may hold a local enactment invalid, RCW 36.70A.302 also provides that development permit applications filed *prior to* the time the city or county receives the Growth Board's determination of invalidity vest to the development regulations under which they were submitted.[24] RCW 36.70A.302(2). Here, even if the urban center development regulations had violated the GMA's requirements and were later declared invalid, all development permit applications submitted prior to the County's receipt of the invalidity determination would remain vested to the invalidated development regulations.

¶27 Authoritative sources support the invalidity provision's plain meaning discussed above. In discussing GMA noncompliance and the effect of an invalidity determination's effect on vesting, Professor Richard L. Settle, a preeminent authority on SEPA,[25] explained:

> When a Growth Board has ruled that local plan provisions or regulations are violative of GMA's requirements, they are

[22] As we noted in *Davidson Serles & Assocs. v. Central Puget Sound Growth Management Hearings Board,* 159 Wn. App. 148, 158 n.8, 244 P.3d 1003 (2010), the Growth Board has never invalidated an ordinance based solely on SEPA noncompliance.

[23] The Growth Board determined the County's deficiency was not that it failed entirely to make a threshold determination regarding SEPA's applicability or to prepare an environmental impact statement. It merely concluded the County's environmental review was insufficient because it failed to analyze reasonable alternatives in violation of RCW 43.21C.030(c)(iii).

[24] Woodway and SRB fail to explain why a less severe finding of procedural noncompliance with SEPA merits no vested rights. Our review of the GMA's legislative development finds no support for this illogical distinction.

[25] The parties agree that Professor Settle is a recognized authority on SEPA issues. His SEPA treatise has been frequently cited in numerous cases.

doomed, but not dead, unless they are subject to an "invalidity" order or until, after remand, they have been revised or repealed to comply with the Act. A 1995 GMA amendment [LAWS OF 1995, ch. 347, § 110] was enacted to clarify ambiguity about the legal status of local enactments after a Growth Board had determined that they were not in compliance with GMA requirements, but before they were locally amended.

The Growth Boards have no authority to adopt and impose local plan provisions or regulations. The Boards' remedial powers are limited to remanding noncompliant provisions to local government for rectification within a specified period of time. . . . As a result of the Boards' limited remedial powers, the uncertain legal status of noncompliant local provisions has tended to paralyze development, and the duration of the paralysis could be extended during judicial review of Board decisions.

The 1995 amendment, along with a more definitive 1997 amendment, [LAWS OF 1997, ch. 429, §§ 1-22,] brought noncompliant GMA plans and regulations out of limbo by providing that "a finding of noncompliance and an order of remand shall not affect the validity of comprehensive plans and development regulations during the period of remand . . . unless the Board makes a determination of invalidity." The statute goes on to provide that "[a] determination of invalidity is prospective in effect and does not extinguish rights that vested under state or local law before receipt of the board's order by the city or county."

. . . .

Once a determination of invalidity has been properly issued and received by a city or county, the specified local provisions become legally inoperative and are not subject to vesting, except for subsequently filed permit applications for owner-built single-family homes, remodeling and expansion of existing structures, and lot line adjustments.

Richard L. Settle, *Washington's Growth Management Revolution Goes to Court*, 23 SEATTLE U. L. REV. 5, 44-46 (1999) (some alterations in original) (footnotes omitted) (quoting RCW 36.70A.300(4), .302(2)).

¶28 In addition, Professor Settle's authoritative SEPA treatise, *The Washington State Environmental Policy Act: A Legal and Policy Analysis* (2011), provides no support for Woodway and SRB's claim that "in circumstances where the Board finds SEPA noncompliance only, the Legislature has not altered the application of preexisting case law[26] concluding that government actions taken in violation of SEPA are void." Woodway's Resp. Br. at 22. On this point, it states the contrary. After noting that "[g]overnment action taken in violation of SEPA generally has been regarded as unlawful, ultra vires, a nullity," Professor Settle explains that the 1995 regulatory reform amendments to the GMA produce a contrary result:

> Since generally one may not obtain vested rights in an invalid regulation, SEPA non-compliance in the adoption of a regulation logically would preclude vested rights in the regulation. *However, a 1995 regulatory reform amendment to the Growth Management Act (GMA) provisions for the Growth Management Hearing Board would produce a contrary result. Under this amendment, a GMA plan, development regulation, or amendment, which the Board found to be in violation of SEPA, nevertheless could support vested rights. A building permit, plat, or, perhaps other regulatory approval applicant would*

---

[26] These cases do not address the critical vesting question at issue in this case. Woodway and SRB cite *Noel v. Cole*, 98 Wn.2d 375, 655 P.2d 245 (1982) (pre-GMA case holding that failure to prepare an environmental impact statement rendered a contract for the sale of timber rights ultra vires and void); *Lassila v. City of Wenatchee*, 89 Wn.2d 804, 576 P.2d 54 (1978) (pre-GMA case vacating comprehensive plan amendment for failure to make threshold determination under SEPA); *Eastlake Community Council v. Roanoke Assocs.*, 82 Wn.2d 475, 481, 513 P.2d 36 (1973) (pre-GMA case holding "no rights may vest where either the [building permit] application submitted or the permit issued fails to conform to the zoning or building regulations"); *Juanita Bay Valley Community Ass'n v. City of Kirkland*, 9 Wn. App. 59, 510 P.2d 1140 (1973) (pre-GMA case remanding grading permit for failure to make threshold determination under SEPA); *South Tacoma Way, LLC v. State*, 169 Wn.2d 118, 233 P.3d 871 (2010) (non-GMA case involving sale of state land); *Responsible Urban Growth Group v. City of Kent*, 123 Wn.2d 376, 868 P.2d 861 (1994) (*RUGG*) (non-GMA case holding actions taken under an ordinance adopted without sufficient public notice were invalid and void); and *Clark County v. Western Washington Growth Management Hearings Board*, 161 Wn. App. 204, 254 P.3d 862 (2011) (inapposite GMA case involving no vested rights issue). And we decline to address the broader question of whether *RUGG* and the pre-GMA cases cited above are overruled or repealed.

*have vested rights in a locally adopted plan or regulation even
if the Board later decided that the local government violated
SEPA by failing to make a proper threshold determination or
prepare an adequate EIS.* Moreover, under the amendment,
vested rights could continue to arise even after the Board finds
noncompliance with SEPA unless the [Growth Board enters a
determination of invalidity].

SETTLE, *supra,* § 19.01[10] (emphasis added) (footnotes
omitted).

¶29 In response to Professor Settle's definitive state-
ment on this issue, Woodway and SRB claim, "Professor
Settle did not cite any authority for his statements and did
not discuss the presumption against implied repeal of
existing case law."[27] Woodway's Resp. Br. at 22-23. These
claims fail. The above quote is clear—Professor Settle relied
on the GMA's 1995 regulatory reform amendments. As
discussed above, these amendments and the subsequent
1997 amendments clearly spelled out when development
rights vest during the appeal of GMA enactments and when
they do not. They also clarified that a violation of SEPA was
not grounds for invalidity and therefore not grounds for the
voiding of any development permit applications relying on
the underlying legislative enactments. Professor Settle cor-
rectly states the effect of these GMA amendments.

¶30 The Supreme Court's discussion in *King County v.
Central Puget Sound Growth Management Hearings Board,*
138 Wn.2d 161, 979 P.2d 374 (1999), is instructive. It
discusses the GMA's administrative review process for
determining whether comprehensive plan provisions com-
ply with the GMA's requirements. As discussed above, the
GMA provides two alternatives—a finding of noncompli-

---

[27] Woodway and SRB also claim that Professor Settle "has not necessarily been
correct in all circumstances." Woodway's Resp. Br. at 23. We are unpersuaded by
this claim because the relevant question is whether he correctly states the rule in
*this* case. We have found Professor Settle to be a "recognized authority on SEPA."
*Waterford Place Condo. Ass'n v. City of Seattle,* 58 Wn. App. 39, 45, 791 P.2d 908
(1990).

ance under RCW 36.70A.300(3)(b) or a determination of invalidity under RCW 36.70A.302. The court explained:

> If the Board finds "noncompliance" it may remand the matter to the county and specify action to be taken and a time within which compliance must occur. County plans and regulations, which are presumed valid upon adoption pursuant to RCW 36.70A.320, remain valid during the remand period following a finding of noncompliance. RCW 36.70A.300(4) ("Unless the board makes a determination of invalidity as provided in RCW 36.70A.302, a finding of noncompliance and an order of remand shall not affect the validity of comprehensive plans and development regulations during the period of remand."). Unlike a finding of noncompliance, a finding of invalidity requires the Board to make a determination, supported by findings of fact and conclusions of law, that the continued validity of the provision would substantially interfere with the fulfillment of the goals of the GMA. RCW 36.70A.302[(1)](b). Upon a finding of invalidity, the underlying provision would be rendered void.

This dichotomy was further explained in this court's recent decision in *Skagit Surveyors & Engineers, LLC v. Friends of Skagit County*, 135 Wn.2d 542, 958 P.2d 962 (1998). In that case, we emphasized the significance of a finding of invalidity versus a finding of noncompliance. *Skagit* cited to the legislative history of the GMA to explain the rationale for differentiating between the two determinations.

> If a comprehensive plan is declared invalid, or if a development regulation is found to be inconsistent with the plan, the validity of any permits issued by the local government under the authority of those development regulations will be called into question.

> Because there are many different circumstances in which this issue may arise, it is not possible to develop a single principle which would apply in all cases. Therefore, the Task force is recommending giving the Growth Management Hearings Board discretion to make the determination on a case-by-case basis. The presumption should be that the plan or regulation will remain in effect unless the Board determines this would violate the policy of the [Growth Management Act].

*King County*, 138 Wn.2d at 181-82 (footnote omitted) (second alteration in original) (quoting *Skagit Surveyors*, 135 Wn.2d at 561-62).

¶31 Nothing in *King County* or the GMA's plain text and comprehensive legislative history supports Woodway and SRB's claim that pre-GMA or non-GMA cases control. Those cases do not apply because they do not address the critical vesting question here—what happens to development permit applications filed with counties and cities relying on recently adopted GMA enactments (comprehensive plan provisions and development regulations) that are being challenged in an administrative appeal before the Growth Board? This question is plainly addressed by the GMA's invalidity provision.

## CONCLUSION

¶32 For the reasons discussed above, we reverse the trial court's summary judgment order granting declaratory and injunctive relief in favor of Town of Woodway and SRB and remand for entry of an order dismissing this lawsuit on Snohomish County's and BSRE's summary judgment motions.[28]

GROSSE and COX, JJ., concur.

Review granted at 177 Wn.2d 1008 (2013).

---

[28] Given our resolution, we need not address the County's and BSRE's alternative jurisdiction and Land Use Petition Act challenges.