FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
APR 10 2014
DATE

for CHIEF JUSTICE



IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| TOWN OF WOODWAY and SAVE RICHMOND BEACH, INC., a Washington non-profit corporation,<br><br>Petitioners,<br><br>v.<br><br>SNOHOMISH COUNTY and BSRE POINT WELLS, LP,<br><br>Respondents. | No. 88405-6<br><br>En Banc<br><br><br>Filed    **APR 1 0 2014** |

OWENS, J. -- In Washington, developers have a vested right to have their development proposals processed under land use plans and development regulations in effect at the time a complete permit application is filed. In this case, we are asked whether our vested rights doctrine applies to permit applications filed under plans and regulations that were later found to be noncompliant with the State Environmental Policy Act (SEPA), chapter 43.21C RCW. We hold that it does. Local land use plans and development regulations enacted under the Growth Management Act (GMA), chapter 36.70A RCW, are presumed valid upon adoption. Should a valid plan or

regulation later be found to violate SEPA, the exclusive remedies provided by the GMA affect only future applications for development—not development rights that have already vested.

In this case, BSRE Point Wells LP (BSRE) submitted complete applications for development permits before the local land use ordinances were found to be noncompliant with SEPA. BSRE's rights vested when it submitted its applications. A later finding of noncompliance does not affect BSRE's already vested rights. We affirm the Court of Appeals and hold that BSRE's development rights vested.

## FACTS

The parties do not dispute the facts of this case. BSRE owns a 61-acre strip of waterfront land in unincorporated Snohomish County known as "Point Wells." For approximately 100 years, the property has been used for petroleum storage and other industrial purposes. Prior to 2009, Snohomish County designated the area "Urban Industrial."

In 2006, BSRE[1] asked Snohomish County to amend its comprehensive plan and zoning regulations to allow for a mixed use/urban center designation and redevelopment of the Point Wells site. BSRE wants to redevelop the property by adding over 3,000 housing units and over 100,000 square feet of commercial and

---

[1] In 2006, the property was owned by Paramount of Washington LLC. Both Paramount and BSRE are owned by the same parent company.

retail space. The petitioners—Town of Woodway (Woodway) and Save Richmond Beach Inc. (Richmond Beach)—oppose the project. They fear that the area lacks the infrastructure needed to support an urban center, namely sufficient roads and public transit. These nearby communities do not want to "bear the burden of providing urban services to the site." Pet. for Discretionary Review (Richmond Beach) at 3.

Snohomish County granted BSRE's request in two separate actions. First, in 2009, the county adopted two ordinances amending its comprehensive plan to allow the redesignation of Point Wells from "Urban Industrial" to "Urban Center." Second, in 2010, it adopted two ordinances amending its building regulations to accommodate Point Wells as an Urban Center. The county prepared a draft supplemental environmental impact statement (EIS), took comments, and finalized the EIS for the comprehensive plan amendments in 2009. It made a determination of nonsignificance for the latter two ordinances (i.e., the development regulations) based on the 2009 EIS. Woodway and Richmond Beach petitioned the growth management hearings board (growth board) to review the four ordinances. A hearing took place before the growth board on March 2, 2011.

Before the growth board issued its final order, BSRE filed two permit applications to redevelop Point Wells. It filed the first permit application on February 14, 2011, two weeks before the hearing before the growth board. BSRE filed the second permit application on March 4, 2011, two days after the hearing before the

growth board. The county published notices of both permits shortly after they were filed. The notices stated that the applications were complete.

On April 25, 2011, the growth board issued its final order. It found that all four ordinances were noncompliant with SEPA. The growth board found that the county's EIS was faulty because it did not consider multiple alternatives to the Urban Center designation—the only alternative it considered was no change at all. The growth board found that the development regulations were noncompliant because they relied on the same faulty EIS as the comprehensive plan amendments. The growth board remanded the four ordinances with instructions to cure them of their SEPA flaws. The growth board also invalidated the comprehensive plan amendments—but not the development regulations—finding that their continued validity would substantially interfere with the goals of the GMA.

Following the growth board's order, the petitioners filed a complaint in superior court seeking a declaration that BSRE's permits had not vested because the ordinances were "void" under SEPA and the GMA. The petitioners also asked for an injunction against the county to stop it from processing BSRE's permits. The parties moved for summary judgment, and the court found for the petitioners. The court ruled that BSRE's rights did not vest to the ordinances later found to be noncompliant with SEPA, and it enjoined the country from processing their permits until the county complied with the growth board's order of remand.

The Court of Appeals reversed. It concluded that the invalidity provision of the

GMA, RCW 36.70A.302(2), controlled the dispute and that "complete and filed

applications vest to those challenged plan provisions and regulations, regardless of the

Growth Board's subsequent ruling in the administrative appeal." *Town of Woodway*

*v. Snohomish County*, 172 Wn. App. 643, 660, 291 P.3d 278 (2013). We granted

review. *Town of Woodway v. Snohomish County*, 177 Wn.2d 1008, 302 P.3d 181

(2013).

## ISSUE

Did BSRE's development rights vest to comprehensive plans and development

regulations that were later found to be flawed under SEPA?

## ANALYSIS

*I.     The Standard of Review*

This case presents questions of pure law. We review questions of law de novo.

*Klem v. Wash. Mut. Bank*, 176 Wn.2d 771, 782, 295 P.3d 1179 (2013).

*II.     Washington's Vested Rights Doctrine and the Plain Language of the GMA
        Make It Clear That BSRE's Development Rights Vested*

Washington's vested rights doctrine strongly protects the right to develop

property. Our state employs a "date certain" standard for vesting. *Abbey Rd. Grp.,*

*LLC v. City of Bonney Lake*, 167 Wn.2d 242, 251, 218 P.3d 180 (2009); *Hull v. Hunt*,

53 Wn.2d 125, 130, 331 P.2d 856 (1958). Under the date certain standard, developers

are entitled "to have a land development proposal processed under the regulations in

effect at the time a complete building permit application is filed, regardless of subsequent changes in zoning or other land use regulations." *Abbey Rd. Grp.*, 167 Wn.2d at 250. "Washington's rule is the minority rule, and it offers [greater] protection of [developers'] rights than the rule generally applied in other jurisdictions." *Id.*

Washington adopted this rule because we recognize that development rights are valuable property interests, and our doctrine ensures that "'new land-use ordinances do not unduly oppress development rights, thereby denying a property owner's right to due process under the law.'" *Id.* at 251 (quoting *Valley View Indus. Park v. City of Redmond*, 107 Wn.2d 621, 637, 733 P.2d 182 (1987)). While it originated at common law, the vested rights doctrine is now statutory. *Erickson & Assocs. v. McLerran*, 123 Wn.2d 864, 867-68, 872 P.2d 1090 (1994); RCW 19.27.095(1) (building permits); RCW 58.17.033(1) (subdivision applications); RCW 36.70B.180 (development agreements).

The plans and regulations to which development rights vest are a product of the GMA. The GMA aims to curtail "uncoordinated and unplanned growth" that "pose[s] a threat to the environment, sustainable economic development, and the health, safety, and high quality of life enjoyed by residents of this state." RCW 36.70A.010. Under the GMA, communities must create comprehensive plans to express general land use

policies in the community and development regulations to implement those plans.
RCW 36.70A.040(3), (4).

The GMA contains a review process that allows parties to challenge comprehensive plans and building regulations, and it provides remedies for plans or regulations that prove to be flawed. In this case, we must interpret those statutory remedies. "The purpose of statutory interpretation is to determine and give effect to legislative intent." *Duke v. Boyd*, 133 Wn.2d 80, 87, 942 P.2d 351 (1997). "The legislative intent should be derived primarily from the statutory language." *Id.* "When the words in a statute are clear and unequivocal, this court is required to assume the Legislature meant exactly what it said and apply the statute as written." *Id.*

The language in the GMA is clear and unequivocal. Comprehensive plans and development regulations, including their amendments, are presumed valid upon adoption. RCW 36.70A.320(1). Should a party wish to challenge adopted plans or regulations, it must petition the growth board for review. RCW 36.70A.280(1). The growth board has exclusive jurisdiction to determine whether a comprehensive plan or building regulation violates the GMA. *Stafne v. Snohomish County*, 174 Wn.2d 24, 34, 271 P.3d 868 (2012) ("[A] party challenging a decision related to a comprehensive plan must seek review before the growth board first."); *see Woods v. Kittitas County*, 162 Wn.2d 597, 614-16, 174 P.3d 25 (2007) (noting that a superior court lacks

jurisdiction over challenges to plans or regulations based on the GMA). As a part of its exclusive jurisdiction to hear GMA challenges to plans and regulations, the growth board also hears SEPA challenges to those plans and regulations. RCW 36.70A.280(1)(a); *Davidson Serles & Assocs. v. City of Kirkland*, 159 Wn. App. 616, 628, 246 P.3d 822 (2011) ("The [growth board] has exclusive jurisdiction to review SEPA challenges to comprehensive plans and development regulations."). If the growth board finds that the plan or regulation is flawed, it has two options: (1) it may enter a finding of noncompliance or (2) it may enter a finding of invalidity. RCW 36.70A.300(3)(b), .302.

If the growth board finds noncompliance, it remands the matter to the county with instructions to comply within a certain time period. RCW 36.70A.300(3)(b). "County plans and regulations . . . *remain valid* during the remand period following a finding of noncompliance." *King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 138 Wn.2d 161, 181, 979 P.2d 374 (1999) (emphasis added); RCW 36.70A.300(4).

If the flaw in the plan or regulation represents a major violation of the GMA, the growth board has the option of determining that the plan or regulation is invalid. To do so, the growth board must first find noncompliance and remand the matter back to the county. RCW 36.70A.302(1)(a). Additionally, the growth board must enter a determination—supported by findings of fact and conclusions of law—that the

8

continued validity of the provision would substantially interfere with the goals of the GMA. RCW 36.70A.302(1)(b). "Upon a finding of invalidity, the underlying provision would be rendered void." *King County*, 138 Wn.2d at 181.

But, like a finding of noncompliance, a finding of invalidity does not apply retroactively to rights that have already vested. The GMA plainly states:

> A determination of invalidity is *prospective in effect* and does not extinguish rights that vested under state or local law before receipt of the [growth] board's order by the city or county. *The determination of invalidity does not apply to a completed development permit application* for a project that vested under state or local law before receipt of the [growth] board's order by the county or city or to related construction permits for that project.

RCW 36.70A.302(2) (emphasis added). Thus, whether or not a challenged plan or regulation is found to be noncompliant or invalid, any rights that vested before the growth board's final order remain vested after the order is issued.

We have considered the remedial powers under the GMA before. In *Skagit Surveyors & Engineers, LLC v. Friends of Skagit County*, 135 Wn.2d 542, 958 P.2d 962 (1998), we addressed whether the GMA authorized the growth board to invalidate pre-GMA ordinances. We relied on the plain language of the statute and held that it did not. *Id.* at 568. We made clear that our duty "is to interpret the statute as enacted by the Legislature, after the Legislature's determination of what remedy best serves the public interest of this state; we will not rewrite the statute." *Id.* at 567.

The reasoning in *Skagit Surveyors* applies here. Though that case dealt with remedial powers of the growth board—and here we review a remedy fashioned by a superior court—there is no reason to believe that a superior court could exceed the remedies provided by the statute as they relate to GMA ordinances. As noted above, the growth board has exclusive jurisdiction to hear SEPA challenges as they relate "to plans, development regulations, or amendments, adopted under [the GMA]." RCW 36.70A.280(1)(a). Its remedies are limited to finding noncompliance or invalidity, and neither finding affects development rights that have already vested.

Here, the growth board reviewed SEPA challenges to the plans and regulations and found a violation. The remedies for such a violation are exclusively provided by the GMA and do not affect rights that have already vested. The superior court erred when it exceeded these exclusive remedies. We affirm the Court of Appeals because of the plain language of the GMA as described above.

III. *Petitioners Argue That Our SEPA Precedent Controls, but the GMA and Its Amendments Have Changed the Law with Respect to SEPA Violations in GMA Plans and Regulations*

Despite the language of the GMA, the petitioners argue that "[g]overnment actions taken in violation of SEPA's procedural requirements are void *ab initio* and *ultra vires*." Suppl. Br. of Pet'r (Woodway) at 6-7. They argue that prior to the GMA, it was well established that a void ordinance did not create vested rights. The petitioners argue that this precedent has not been overruled by the GMA and that no

development rights can vest if they rely on ordinances that do not comply with

SEPA's procedural requirements. We disagree.

The petitioners cite a list of cases that are distinguishable: *Eastlake Cmty.*

*Council v. Roanoke Assocs.*, 82 Wn.2d 475, 481, 487, 513 P.2d 36 (1973) (pre-GMA

case holding that rights did not vest when permit renewal did not conform to zoning

or building regulations and when no EIS was made); *Juanita Bay Valley Cmty. Ass'n*

*v. City of Kirkland*, 9 Wn. App. 59, 73-74, 510 P.2d 1140 (1973) (pre-GMA case

remanding a grading permit for failure to make an initial determination of

environmental significance under SEPA); *Lassila v. City of Wenatchee*, 89 Wn.2d

804, 816-17, 576 P.2d 54 (1978) (pre-GMA case vacating a comprehensive plan

amendment when the city failed to determine whether the amendment would have a

significant impact on the environment); *Noel v. Cole*, 98 Wn.2d 375, 380-81, 655 P.2d

245 (1982) (pre-GMA case holding that a timber contract was void and ultra vires

where the Department of Natural Resources did not prepare an EIS); *Responsible*

*Urban Growth Grp. v. City of Kent*, 123 Wn.2d 376, 381, 389-90, 868 P.2d 861

(1994) (non-GMA and non-SEPA case invalidating a rezone and voiding a building

permit issued under that rezone when the rezone failed to meet statutory and due

process notice requirements); *S. Tacoma Way, LLC v. State*, 169 Wn.2d 118, 124-26,

233 P.3d 871 (2010) (non-GMA and non-SEPA case where procedural error did not

render the sale of state land ultra vires).

These cases are off point—none of them deal with plans or regulations reviewed by the growth board under the GMA. The GMA fundamentally changed the review process for local land use plans and building regulations. Under the current statute, the growth board hears petitions alleging that local planning is not in compliance with the requirements of the GMA "or [SEPA] as it relates to plans, development regulations, or amendments, adopted under RCW 36.70A.040." RCW 36.70A.280(1)(a). As noted above, the growth board's power to review these petitions is exclusive and the growth board's remedies are limited by statute. The growth board can find noncompliance or invalidity, but neither finding retroactively affects vested rights. RCW 36.70A.300(4), .302(2). Thus, any pre-GMA case or case that dealt with SEPA outside the context of GMA plans or development regulations has no bearing on this case.

This area of law is entirely statutory, and we have recognized that amendments to statutes will supersede judicial precedent. In *Dioxin/Organochlorine Center v. Pollution Control Hearings Board*, 131 Wn.2d 345, 356-61, 932 P.2d 158 (1997), we held that *Noel*—one of the cases cited by the petitioners—was no longer authoritative for the proposition that a superior court could review certain forest practices for violations of SEPA. We found that the legislature had amended SEPA to clarify that the superior court could not review the issue. *Id.* at 362. Here too, amendments to the GMA and SEPA have superseded prior cases. The Court of Appeals discussed the

amendments to the GMA at length, but a short summary shows that the legislature fundamentally altered review of GMA plans and regulations.

In 1991, the legislature amended the GMA to establish a process for reviewing comprehensive plans and regulations. LAWS OF 1991, 1st Sp. Sess., ch. 32, § 9. It gave the newly created growth board the power to review plans and regulations not only for GMA violations but also for SEPA violations. *Id.* (now codified as RCW 36.70A.280(1)). In 1995, the legislature amended the GMA and SEPA, simplifying the growth board's review process by giving it the two remedies discussed above— noncompliance or invalidity. LAWS OF 1995, ch. 347, § 110. Importantly, the legislature made it clear that the GMA "should serve as the integrating framework for all other land-use related laws." LAWS OF 1995, ch. 347, § 1. While the 1995 amendment included the provision that a finding of invalidity applies only prospectively and does not affect rights that vested before the growth board's order, the legislature clarified this point even further with an amendment in 1997. That amendment recodified the GMA's invalidity provision in a stand-alone section and added a second sentence emphasizing the point further. LAWS OF 1997, ch. 429, § 16(2) ("The determination of invalidity does not apply to a completed development permit application for a project that vested under state or local law before receipt of the [growth] board's order by the county or city or to related construction permits for that project.").

As the Court of Appeals noted, the legislature was well informed when it made the amendments. The legislature relied on several government reports that examined the continuing validity of noncompliant plans and regulations and vested rights issues. *See Woodway*, 172 Wn. App. at 654-60 (discussing the amendments in detail); WASH. STATE OFFICE OF FIN. MGMT., GOVERNOR'S TASK FORCE ON REGULATORY REFORM: FINAL REPORT 52 (Dec. 20, 1994) (recommending that a plan or regulation should remain in effect unless later found invalid); WASH. LAND USE STUDY COMM'N, 1996 ANNUAL REPORT EXEC. SUMMARY 20 (Jan. 29, 1997) (recommending an amendment clarifying that projects that vested prior to a growth board order are not affected by an order of invalidity).

This history shows that the legislature thoughtfully considered the review process for comprehensive plans and regulations under the GMA. It purposefully integrated SEPA review with GMA review and outlined the remedies for faulty plans and regulations. It considered the impact that GMA review would have on vested rights and chose not to disturb this state's strong vested rights doctrine. Our decision reflects the clear intent of the legislature, and we apply the statute as written.

IV. *Richmond Beach's Argument That the Court Should Not Allow the Vested Rights Doctrine "To Be Used As a Sword" Is Not Persuasive*

Richmond Beach argues that the Court of Appeals erred by allowing the vested rights doctrine to be used as a "'sword' to push through an otherwise-illegal development, rather than as a 'shield' to protect the property owner from fluctuating

land use policies." Suppl. Br. of Pet'r (Richmond Beach) at 4. Richmond Beach

evokes this court's warning in *Erickson* that if rights vest too easily, the public interest

can be subverted. Richmond Beach criticizes the decision below for failing to

"uphold important principles such as protection of property rights, certainty,

predictability, due process, good faith, or fairness." *Id.* These arguments miss the

mark.

Our vested rights doctrine protects due process and property interests by setting

a clear date for vesting development rights, and we have expressly rejected a bad faith

exception to that rule. *Allenbach v. City of Tukwila*, 101 Wn.2d 193, 676 P.2d 473

(1984). In *Allenbach*, the city of Tukwila passed an ordinance that downzoned the

developer's property from multifamily to single-family residential. *Id.* at 194-95.

Nearly two months later—one day before the ordinance took effect—a developer

submitted a permit application for a multifamily development. *Id.* at 195. The city

argued that the developer acted in bad faith and that it did not have to process the

permit applications under the old zoning laws. *Id.*

We rejected the city's argument. We reiterated that the court applies a date

certain standard and "avoids the morass and uncertainties" of determining bad faith.

*Id.* at 198. Contrary to Richmond Beach's argument, the date certain rule creates

certainty and predictability for all parties and protects property rights. There is no bad

faith exception to that rule. *Id.* at 199-200. Only one bad faith consideration applies

to developers—they must not make knowing misrepresentations in their permit applications. *Lauer v. Pierce County*, 173 Wn.2d 242, 262, 267 P.3d 988 (2011). No party alleges that BSRE made knowing misrepresentations in this case. Richmond Beach's arguments are unpersuasive, and we affirm.

## CONCLUSION

BSRE's development rights vested to the plans and regulations in place at the time it submitted its permit applications. Developers' rights vest to the ordinances in effect when a complete permit application is submitted. The plain language of the GMA indicates that a later finding of noncompliance under SEPA does not affect rights that have already vested. The petitioners cite cases that have been largely superseded by the GMA and its amendments. Additionally, we do not consider the good or bad faith of a developer, other than their duty not to make knowing misrepresentations on permit applications. For these reasons, we affirm the Court of Appeals.

WE CONCUR:

Madsen, C.J.

Fairhurst, J.

Wiggins, J.

González, J.

No. 88405-6

C. JOHNSON, J. (dissenting)—The vested rights doctrine is a judicially created doctrine originally anchored in due process principles of fundamental fairness. The doctrine operates to protect citizens and developers from the government changing the conditions and requirements that existed and were relied on when a completed building permit or development proposal was submitted. In other words, under the doctrine, except under limited circumstances, the government could not change the rules of the game after it had already been played. But no laws changed that affected the development in this case. It was illegal under the Growth Management Act (GMA), chapter 36.70A RCW, and the State Environmental Policy Act (SEPA), chapter 43.21C RCW, at all times. The majority's decision erroneously creates a troubling erosion of the requirements under the GMA and, more disturbing, SEPA.

The vested rights doctrine has never been applied to circumvent and eliminate statutory requirements existing at the time a development proposal is submitted. The GMA controls the development of land and guides a county's options in planning for growth, development, and expansion. Similarly, SEPA exists to condition development in order to protect our environment and minimize the environmental impact caused by development. The majority embraces a radical departure from our cases and uses the vested rights doctrine as a sword to disregard the mandates of both the GMA and SEPA. The record in this case establishes that both the county and developer likely knew their plan would not survive a challenge unless the anticipated Growth Management Hearings Board's decision to invalidate their proposal could be cleverly circumvented. No principle of fundamental fairness applies where the actions of the county and developer are designed to circumvent the existing requirements of the GMA and SEPA. The majority allows "vesting" of essentially an illegal development.

Point Wells is an isolated 61-acre site of a century's worth of petroleum-based industrial use on the southwest corner of Snohomish County. It is largely inaccessible from Snohomish County. Instead, the only access is from the south through King County and the city of Shoreline along Richmond Beach Drive, a

narrow two-lane neighborhood street that dead-ends at Point Wells. This road cannot provide adequate road access, let alone highway access, but is the only present or anticipated vehicle access to Point Wells, where BSRE Point Wells, LP plans to build at least 3,000 housing units as well as commercial and retail space, with traffic estimated to add 12,860 car trips per day. There are no express or high-capacity transit routes within 2.5 miles of Point Wells, and although the Sound Transit light rail line runs through Point Wells, it does not stop in Point Wells, nor is there a plan to provide a stop. Reasonable access to this type of development is, and always has been, a requirement, but such access does not exist here and probably never will.

Point Wells was originally designated as "urban industrial," but upon BSRE's request, Snohomish County (County) amended its comprehensive plan to designate Point Wells as "urban center"—the county's most dense mixed-use designation—and then amended its development regulations to accommodate Point Wells as an urban center. Under the County's own comprehensive plan, urban centers must be "located along an existing or planned high capacity transit route." Clerk's Papers (CP) at 214. The comprehensive plan also required that urban centers be "located adjacent to a freeway/highway and a principal arterial road . . .

or be located on a regional high capacity transit route." CP at 197. The County was well aware of such urban center requirements, not only because these requirements are in its own code but also because the County already had five designated urban centers, each identified and named by a highway intersection.[1]

The town of Woodway and Save Richmond Beach, Inc. petitioned the Growth Management Hearings Board (Board) to challenge the comprehensive plan amendments and development regulations, and in August 2010, a hearing was set before the Board. On February 14, 2011, BSRE submitted a subdivision and land-disturbing activity permit application with the county. On March 2, 2011, the hearing before the Board took place. Two days later, BSRE filed a development permit application with the County.

On April 25, 2011, the Board invalidated the county's comprehensive plan amendments and found the development regulations noncompliant with SEPA. In its order, the Board stated that it was left with "'a firm and definite conviction that a mistake ha[d] been committed.'" CP at 113.

The Board noted that Point Wells was the County's only urban center without either transit access or the existing road infrastructure to support high-

---

[1] CP at 107.

capacity vehicle access. The County had argued that Point Wells was "'located on a regional high capacity transit route'" notwithstanding the "lack of existing or planned access to that route." CP at 108. Understandably, the Board rejected this argument. Such an interpretation, the Board reasoned, "le[d] to an absurd result: an urban center with limited transportation access." CP at 108. Despite the fact that adequate urban services including transit, water, sewer, police, fire, emergency, and trash collection for Point Wells were neither available nor clearly planned, as noted by the Board, BSRE had argued that its promise to fund the building of a transit center, on-site police and fire stations, and a commuter rail station was the equivalent of the actual governmental commitment required by the GMA. The Board also rejected this argument, noting that "'Trust Us' is not a GMA Plan." CP at 137. As a result, the Board invalidated the County's comprehensive plan amendments. CP at 166.

Finally, the final supplemental environmental impact statement (FSEIS) submitted by the County, as required by SEPA, considered only two alternatives: (1) the land use and zoning requested by BSRE or (2) no action. The Board found the FSEIS inadequate because there were other land use designations the County could have considered that would have been less dense, generated fewer vehicle

trips, and been less of a strain on public facilities and services. CP at 148. As a result, the Board held that all four ordinances did not comply with SEPA and remanded them back to the County to take legislative action to comply with SEPA. CP at 166-67.

According to the majority, however, because BSRE filed two permit applications before the Board could invalidate the proposal, it now has a vested right to develop Point Wells as an urban center notwithstanding the development's illegality and clear deficiencies. To the majority, BSRE would have a vested right regardless of whether it plans to build 3,000 or 30,000 new housing units in Point Wells. This is not the situation envisioned by the vested rights doctrine or what the statute provides.

The purpose of the vested rights doctrine is to allow developers to determine the rules that govern their land development. Once a developer files a complete permit application, "a city cannot frustrate the development by enacting new zoning regulations." *W. Main Assocs. v. City of Bellevue*, 106 Wn.2d 47, 51, 720 P.2d 782 (1986). The doctrine is supported by notions of fundamental fairness because "citizens should be protected from the 'fluctuating policy' of the legislature." *W. Main*, 106 Wn.2d at 51 (quoting THE FEDERALIST No. 44, at 301

(James Madison) (Jacob E. Cooke ed., 1961)). The doctrine is meant to protect the land owner/developer from the municipality. *See Noble Manor Co. v. Pierce County*, 133 Wn.2d 269, 943 P.2d 1378 (1997) (right vested when city changed zoning ordinance after receiving short plat subdivision but before plat was approved); *Parkridge v. City of Seattle*, 89 Wn.2d 454, 573 P.2d 359 (1978) (developer had vested right, despite incomplete application, because of diligent efforts to complete application, which were frustrated by the city); *Hull v. Hunt*, 53 Wn.2d 125, 331 P.2d 856 (1958) (right vested day before city's amended zoning ordinance went into effect); *State ex rel. Ogden v. City of Bellevue*, 45 Wn.2d 492, 275 P.2d 899 (1954) (right vested when the city attempted to rezone upon receiving building permit). The majority and legislature fail to see this nuance.

In this case, BSRE needed no such protection from the County because there was no fluctuation of county legislation during the pendency of BSRE's permit applications; the rules and requirements remained unchanged throughout. There was not even a threat of fluctuating legislation during this time as Snohomish County was in fact defending to the Board the very legislation *requested* by BSRE and under which BSRE claims its development rights vested. No case exists in which this court has held that a developer has a vested right to build under invalid,

7

site-specific legislation that it specifically requested and subsequently defended on appeal and of which it is the sole beneficiary.

The majority finds that BSRE has a development right under RCW 36.70A.302(2), which provides:

> A determination of invalidity is prospective in effect and does not extinguish rights that vested under state or local law before receipt of the board's order by the city or county. The determination of invalidity does not apply to a completed development permit application for a project that vested under state or local law before receipt of the board's order by the county or city or to related construction permits for that project.

This provision must be read consistent with the vested rights doctrine and not, as the majority reasons, as an independent, free-standing vesting provision. The statute is written in the past tense: invalidity does not apply to applications for a project *that vested*. It does not create rights. Rather, it protects only rights that already existed by way of vesting and assumes a separate mechanism by which those rights are created in the first place, namely our vested rights doctrine. Because BSRE should not have an illegal development right under our vested rights doctrine, it cannot use RCW 36.70A.302(2) as a shield to protect its illegal use.

8

Finally, the majority minimizes the environmental impact of BSRE's vested right by noting only that Woodway and Save Richmond Beach "fear that the area lacks the infrastructure." Majority at 3. As noted by the Board, however, the area in fact lacks all of the necessary infrastructure to support an urban center. Point Wells lies on the County's southern border and is not accessible from anywhere within its own boundaries. The task of providing transportation, utilities, and police and fire protection, to name a few, in fact fully burdens King County; the city of Shoreline; and a narrow, inadequate residential road. Such an absurd result cannot be what the vested rights doctrine was intended to protect.

The GMA was enacted to fight "uncoordinated and unplanned growth," RCW 36.70A.010, but in finding that BSRE has a vested right to develop Point Wells as an urban center, the majority has facilitated such uncoordinated, unplanned, and in fact illegal growth. The GMA and SEPA should be read in harmony and given effect, and not, as the majority holds, written out of existence. The vesting rights doctrine cannot be used as a sword to eviscerate the purpose and function of the GMA and SEPA.

Respectfully, I dissent.