FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
SEPTEMBER 19, 2024



_González, C.J._
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
SEPTEMBER 19, 2024

_Sarah Pendleton_
SARAH R. PENDLETON
ACTING SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| KING COUNTY, a political subdivision of the state of Washington, | No. 102177-1 |
| Respondent, | |
| v. | En Banc |
| FRIENDS OF SAMMAMISH VALLEY, a Washington nonprofit corporation; and FUTUREWISE, | |
| Petitioners, | Filed: <u>September 19, 2024</u> |
| A FARM IN THE SAMMAMISH VALLEY LLC; MARSHALL LEROY d/b/a ALKI MARKET GARDEN; EUNOMIA FARMS, LLC; OLYMPIC NURSERY INC.; C-T CORP.; ROOTS OF OUR TIMES COOPERATIVE; REGENERATION FARM LLC; HOLLYWOOD HILLS ASSOCIATION; TERRY AND DAVID R. ORKIOLLA; and JUDITH ALLEN, | |
| Defendants. | |

JOHNSON, J.—This case concerns King County Ordinance 19030

(Ordinance or Ordinance 19030), which altered zoning and business licensing

regulations for wineries, breweries, and distilleries (WBDs), and accompanying tasting rooms, within land designated as agricultural and rural under the King County comprehensive plan. The issue presented is whether the Ordinance and the investigations King County (County) undertook prior to passage comply with the requirements set forth in the Growth Management Act (GMA), ch. 36.70A RCW, and the State Environmental Policy Act (SEPA), ch. 43.21C RCW.

The Central Puget Sound Growth Management Hearings Board (Board) determined that the County failed to comply with SEPA and the GMA and invalidated portions of the Ordinance. Appeal of the Board's final order was certified directly to the Court of Appeals, which reversed the board decision. Friends of Sammamish Valley (FOSV) and Futurewise sought review, arguing that the County's initial failure to fully engage with the threshold determination process under SEPA and failure to address preservation of land designated agricultural required invalidation under the GMA. The County, in response, argues that SEPA and the GMA do not require them to consider potential environmental impacts because the Ordinance is a "nonproject action" not requiring environmental review under SEPA and because the GMA presumes that an ordinance is valid on adoption. We reverse the Court of Appeals and reinstate the Board's order.

FACTS AND PROCEDURAL HISTORY

Ordinance 19030 applies to all of King County, but the focus of this case is on the impact to the agricultural and rural areas of Sammamish Valley. Sammamish Valley, particularly the Woodinville area, has developed into a destination in Washington for WBDs and tasting rooms. Many alcohol related businesses are located in the Woodinville city limits, but many have also been established outside the city limits in unincorporated King County. The County's comprehensive plan designated certain areas in Sammamish Valley as appropriate for long-term protection and classified that land as agricultural under King County's comprehensive plan. Expansion, authorization, and restrictions on additional WBDs are addressed under the Ordinance.

In response to the growing adult-beverage industry, the King County Council initiated the "Sammamish Valley Wine and Beverage Study" in 2016. The study provided policy and code recommendations regarding economic development, transportation, agriculture land use, and rural land use. The study outlined accessory uses in the agricultural and rural areas and how such uses could be expanded to serve the economic development of the community. It also uncovered that 54 WBDs were operating in unincorporated King County, and only 4 of those had permits to operate. King County produced another action report in

2018, which gave specific zoning code recommendations. The findings and recommendations of the two studies became the basis for Ordinance 19030.

Before passage of the Ordinance, county staff completed a SEPA checklist, in order to make a threshold determination about the potential environmental impact of the proposed action. Admin. R. (AR) at 29-48; WAC 197-11-315. The County's responsible official determined that the proposed Ordinance was a nonproject action and made a threshold determination of nonsignificance (DNS), indicating no adverse environmental issues were implicated. AR at 26-27; WAC 197-11-310, -330, -340. As a result of the staff report, no environmental impact statement (EIS) was conducted after the DNS. The County passed Ordinance 19030 on December 4, 2019.

The Ordinance made a number of zoning changes in rural and agricultural areas of King County, imposing new licensing requirements for alcoholic beverage businesses in these areas. A number of alterations were made to the existing code, some tightening restrictions on allowed uses and others expanding allowed uses. The Ordinance set different sizes of WBD facilities, classifying the uses as I, II, or III. The Ordinance eliminated the requirement that beverage sales must be limited to products produced on-site and grown in the Puget Sound and replaced it with a requirement that 60 percent of the products processed must be grown on-site. The Ordinance amended the former code to require that tasting and retail sales of

products may occur only as an accessory to the primary WBD production use, whereas the former code simply stated that the tasting of products must be provided in accordance with state law. The Ordinance established temporary use permits for large events and imposed limits on the number of guests allowed based on the size of the facility (WBD IIs can have up to 150 people, WBD IIIs can have up to 250 people). The Ordinance authorized that up to 25 percent of any site with these facilities could be paved. The Ordinance also created "Demonstration Project Overlay A" in the area adjacent to Woodinville, establishing "remote tasting rooms." Ordinance, Attach. A. Tasting rooms were not explicitly allowed prior to the Ordinance, and the Ordinance provided an avenue for them to become licensed on the parcels in the demonstration project area.

FOSV filed a petition for review with the Board on March 4, 2020, challenging the validity of Ordinance 19030. Futurewise filed a petition for review with the Board on March 5, 2020, challenging the same. The Board provided an order on dispositive motions, declaring Ordinance 19030 invalid on May 26, 2020. In sum, the Board agreed with the petitioners as to the threshold issues of the timing and sufficiency of the SEPA checklist and determined that the Ordinance was invalid for violations of the GMA.

The County, in an initial proceeding, appealed that order to the superior court. The superior court reversed the Board's order. It found that the Board had

exceeded its statutory authority in reviewing the motions for summary judgment, and had improperly applied the CR 56 standard. The matter was remanded back to the Board, with a direction that it rescind its order of invalidity and conduct a full hearing on the issues of SEPA and GMA compliance.

The Board held a full hearing on the merits and issued a new final decision and order on January 3, 2022, with a corrected version issued on January 27, 2022. The Board evaluated a number of SEPA issues and concluded that the County had failed to establish a prima facie showing of SEPA compliance and that the County violated SEPA by basing its DNS on an inadequate checklist. The Board also considered a number of GMA issues and concluded that the adoption of Ordinance 19030 was clearly erroneous in light of the requirements of the GMA and SEPA, and that the Ordinance substantially interfered with GMA goals. Sections 12-29, and 31, and map amendments No. 1 and No. 2 of the Ordinance were declared invalid, and the matter was remanded to the County to come into compliance.

The County again appealed, and the action was transferred to Division One of the Court of Appeals. The Court of Appeals reversed the Board's order of invalidity and remanded for entry of a finding of compliance with the GMA and

SEPA. *King County v. Friends of Sammamish Valley*, 26 Wn. App. 2d 906, 530 P.3d 1023, *review granted*, 2 Wn.3d 1006 (2023). We accepted review.[1]

ISSUES[2]

I.  Does Ordinance 19030 violate the GMA?

II. Did the DNS issued for Ordinance 19030 violate SEPA?

ANALYSIS

I.      GMA Compliance

Under the GMA, authority is assigned to Growth Management Hearing Boards to adjudicate compliance. RCW 36.70A.280, .300; *Lewis County v. W. Wash. Growth Mgmt. Hr'gs Bd.*, 157 Wn.2d 488, 497, 139 P.3d 1096 (2006). Planning agencies are given broad deference by the reviewing Board. "[C]omprehensive plans and development regulations, and amendments thereto, adopted under [the GMA] are presumed valid upon adoption." RCW 36.70A.320(1).

The presumption of validity can be rebutted where the Board finds evidence of a clear error based on the requirements of the GMA. "The board shall find

---

[1] A number of amici briefs have been submitted in support of FOSV and Futurewise from Agricultural Organizations, Black Farmers Collective, Western Washington Agricultural Association, Orca Conservancy, Sierra Club, and Susan Boundy-Sanders and Paula Waters.

[2] The parties have presented different classifications of the issues in this case, with the two petitioners each presenting three separate issues, and the County presenting its own issues. However, all of the issues can be boiled down to these two questions.

compliance unless it determines that the action by the state agency, county, or city is clearly erroneous in view of the entire record before the board and in light of the goals and requirements of this chapter." RCW 36.70A.320(3). An action is "'clearly erroneous'" if the Board is "'left with the firm and definite conviction that a mistake has been committed.'" *King County v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 142 Wn.2d 543, 552, 14 P.3d 133 (2000) (quoting RCW 36.70A.320(3); *Dep't of Ecology v. Pub. Util. Dist. No. 1*, 121 Wn.2d 179, 201, 849 P.2d 646 (1993)).

When a board decision is appealed, courts review the Board's decision pursuant to the Administrative Procedure Act (APA), chapter 34.05 RCW. RCW 34.05.570(3). The court looks at the record before the Board and reviews the Board's legal conclusions de novo, giving substantial weight to the Board's statutory interpretations. When there are mixed questions of law and fact, the court determines the law, and then applies the law to the facts as found by the Board. *Thurston County v. W. Wash. Growth Mgmt. Hr'gs Bd.*, 164 Wn.2d 329, 341, 190 P.3d 38 (2008).

The burden is on the party asserting the error to demonstrate that the Board erroneously interpreted or applied the law, or that the order is not supported by substantial evidence. *King County*, 142 Wn.2d at 553. Boards established by the GMA are to be given deference because of the specialized experience its members

are required to have.[3] Courts review the Board's order for substantial evidence—whether a sufficient quantity of evidence exists in the record that a fair-minded person could be persuaded of the truth or correctness of the Board's order. *Thurston County*, 164 Wn.2d at 341.

The deference afforded to planning agencies by the Board and the deference granted to the Board by reviewing courts may seem somewhat contradictory. However, in *Quadrant Corp. v. Central Puget Sound Growth Management Hearings Board*, 154 Wn.2d 224, 110 P.3d 1132 (2005), we recognized that deference afforded to county planning actions supersedes the deference granted by the APA, so long as the county planning action meets and is consistent with the goals and requirements of the GMA. We held that when a Board fails to apply the more deferential standard of review, the ruling is not entitled to deference. *Quadrant*, 154 Wn.2d at 238.

Though the parties do not substantively dispute the standard of review, the petitioners emphasize that substantial weight should be given to the Board, while the County emphasizes that deference must be given to county planning decisions per the legislative intent. Here, the Board acknowledged and clearly stated that it was applying the deferential standard of review in its ruling. Unless the facts show

---

[3] "The board shall consist of five members qualified by experience or training in pertinent matters pertaining to land use law or land use planning and who have experience in the practical application of those matters." RCW 36.70A.250(1).

that the Board failed to apply the standard of review correctly, the Board decision is entitled to deference when challenged. The determining question therefore is whether substantial evidence shows that the County's interpretation of the GMA is clearly erroneous, or put another way, whether a sufficient quantity of evidence exists in the record that a fair-minded person could be persuaded that the Board was correct.

The GMA is found in chapter 36.70A RCW, and the rules for the GMA are found in chapter 365-196 WAC. The GMA is "intended to recognize the importance of rural lands and rural character to Washington's economy, its people, and its environment, while respecting regional differences." RCW 36.70A.011. The GMA was established to provide a framework for land use planning and regulation of development, in response to unplanned growth and a lack of common goals. WAC 365-196-010. RCW 36.70A.020 sets a number of goals, which are not exclusive but may be supplemented by cities and counties so long as no conflict with the GMA arises. WAC 365-196-060. The goals include encouraging urban growth, reducing sprawl, and protecting and enhancing the natural environment. RCW 36.70A.020.[4]

---

[4] "The following goals are not listed in order of priority and shall be used exclusively for the purpose of guiding the development of comprehensive plans, development regulations, and, where specified, regional plans, policies, and strategies:
"(1) Urban growth. Encourage development in urban areas where adequate public

The GMA requires that development regulations preserve natural resource and critical areas, and that land adjacent to such areas not interfere in their continued use. RCW 36.70A.060. Counties' comprehensive plans must include measures governing rural development and protection of the rural character of the area, with measures such as containing and controlling rural development, protecting critical areas, and protecting against conflicts with agricultural, forest, and resource lands. RCW 36.70A.070(5). The GMA requires that comprehensive land use plans must conform to the act, and any development regulations must be consistent with and implement the comprehensive plans. RCW 36.70A.130. Counties may also use innovative zoning techniques in agricultural lands to conserve the areas and encourage agricultural economy, but nonagricultural uses

---

facilities and services exist or can be provided in an efficient manner.

"(2) Reduce sprawl. Reduce the inappropriate conversion of undeveloped land into sprawling, low-density development.

". . . .

"(8) Natural resource industries. Maintain and enhance natural resource-based industries, including productive timber, agricultural, and fisheries industries. Encourage the conservation of productive forestlands and productive agricultural lands, and discourage incompatible uses.

". . . .

"(10) Environment. Protect and enhance the environment and enhance the state's high quality of life, including air and water quality, and the availability of water.

". . . .

"(12) Public facilities and services. Ensure that those public facilities and services necessary to support development shall be adequate to serve the development at the time the development is available for occupancy and use without decreasing current service levels below locally established minimum standards."

should be limited to lands not suitable for agricultural purposes. RCW

36.70A.177.[5]

---

[5] "(1) A county or a city may use a variety of innovative zoning techniques in areas designated as agricultural lands of long-term commercial significance under RCW 36.70A.170. The innovative zoning techniques should be designed to conserve agricultural lands and encourage the agricultural economy. Except as provided in subsection (3) of this section, a county or city should encourage nonagricultural uses to be limited to lands with poor soils or otherwise not suitable for agricultural purposes.

"(2) Innovative zoning techniques a county or city may consider include, but are not limited to:

"(a) Agricultural zoning, which limits the density of development and restricts or prohibits nonfarm uses of agricultural land and may allow accessory uses, including nonagricultural accessory uses and activities, that support, promote, or sustain agricultural operations and production, as provided in subsection (3) of this section;

"(b) Cluster zoning, which allows new development on one portion of the land, leaving the remainder in agricultural or open space uses;

"(c) Large lot zoning, which establishes as a minimum lot size the amount of land necessary to achieve a successful farming practice;

"(d) Quarter/quarter zoning, which permits one residential dwelling on a one-acre minimum lot for each one-sixteenth of a section of land; and

"(e) Sliding scale zoning, which allows the number of lots for single-family residential purposes with a minimum lot size of one acre to increase inversely as the size of the total acreage increases.

"(3) Accessory uses allowed under subsection (2)(a) of this section shall comply with the following:

"(a) Accessory uses shall be located, designed, and operated so as to not interfere with, and to support the continuation of, the overall agricultural use of the property and neighboring properties, and shall comply with the requirements of this chapter;

"(b) Accessory uses may include:

"(i) Agricultural accessory uses and activities, including but not limited to the storage, distribution, and marketing of regional agricultural products from one or more producers, agriculturally related experiences, or the production, marketing, and distribution of value-added agricultural products, including support services that facilitate these activities; and

"(ii) Nonagricultural accessory uses and activities as long as they are consistent with the size, scale, and intensity of the existing agricultural use of the property and the existing buildings on the site. Nonagricultural accessory uses and activities, including new buildings, parking, or supportive uses, shall not be located outside the general area already developed for buildings and residential uses and shall not otherwise convert more than one acre of agricultural land to nonagricultural uses; and

"(c) Counties and cities have the authority to limit or exclude accessory uses otherwise authorized in this subsection (3) in areas designated as agricultural lands of long-term

The land focused on in this case lies outside of the city of Woodinville and has been designated under King County's comprehensive plan as agricultural, rural, or a combination of the two. This designation is significant here because an agricultural designation carries with it a statutory requirement that cities and counties assure the agricultural and rural nature of the land is preserved. RCW 36.70A.060(1)(a).[6]

In its assessment of the Ordinance, the Board focused on four areas of GMA compliance—accessory uses, comprehensive plan farmland and environmental policies, comprehensive plan agricultural production district buffer policies, and County demonstration project requirements—all areas designated under the County's comprehensive plan.

First, the Board found that the Ordinance violated RCW 36.70A.060(1)(a) because it failed to conserve productive agricultural land by allowing incompatible uses, and it did not restrict agricultural accessory uses and activities to be

---

commercial significance.

"(4) This section shall not be interpreted to limit agricultural production on designated agricultural lands."

[6] "Each county that is required or chooses to plan under RCW 36.70A.040, and each city within such county, shall adopt development regulations on or before September 1, 1991, to assure the conservation of agricultural, forest, and mineral resource lands designated under RCW 36.70A.170. Regulations adopted under this subsection may not prohibit uses legally existing on any parcel prior to their adoption and shall remain in effect until the county or city adopts development regulations pursuant to RCW 36.70A.040. Such regulations shall assure that the use of lands adjacent to agricultural, forest, or mineral resource lands shall not interfere with the continued use, in the accustomed manner and in accordance with best management practices, of these designated lands for the production of food, agricultural products, or timber, or for the extraction of minerals."

consistent with the size, scale, and intensity of the existing agricultural uses on the property. Also, the Ordinance's allowing further development in areas that did not have "'prime soil[]'" impermissibly expanded nonagricultural uses, thus violating RCW 36.70A.177(3)(b)(ii). AR at 49433.

Next, when reviewing consistency with comprehensive plan farmland and environmental policies, the Board concluded that the matter was not ripe for review until the County had remedied the SEPA and GMA noncompliance issues the Board had already identified. The Board assessed several matters addressing compliance with comprehensive plan agricultural production district buffer policies, and concluded that implementing the Ordinance without adequate environmental review and sufficient development regulations to ensure compatibility with the natural environment would thwart the county's

implementation of King County comprehensive plan policy R-201,[7] in violation of

RCW 36.70A.130(1)(e).[8]

Finally, the Board addressed whether the Ordinance's demonstration project

was consistent with established requirements set by the County. The Board found

that the remote tasting rooms in Demonstration Project Overlay A thwarted

policies and enforcement of zoning regulation King County Code 21A.32.040,

which provides, "Any use, structure or other site improvement not established in

compliance with use and development standards in effect at the time of

---

[7] "King County's land use regulations and development standards shall *protect* and *enhance* the following attributes associated with rural character and the Rural Area:
"a. The natural environment, particularly as evidenced by the health of wildlife and fisheries (especially salmon and trout), aquifers used for potable water, surface water bodies including Puget Sound and natural drainage systems and their riparian corridors;
"b. Commercial and noncommercial farming, forestry, fisheries, mining, home-occupations and home industries;
"c. Historic resources, historical character and continuity important to local communities, as well as archaeological and cultural sites important to tribes;
"d. Community small-town atmosphere, safety, and locally owned small businesses;
"e. Economically and fiscally healthy Rural Towns and Rural Neighborhood Commercial Centers with clearly defined identities compatible with adjacent rural, agricultural, forestry and mining uses;
"f. Regionally significant parks, trails and open space;
"g. A variety of low-density housing choices compatible with adjacent farming, forestry and mining and not needing urban facilities and services;
"h. Traditional rural land uses of a size and scale that blend with historic rural development; and
"i. Rural uses that do not include primarily urban-serving facilities." AR at 9236 (emphasis added).
[8] "Any amendment of or revision to a comprehensive land use plan shall conform to this chapter. Any amendment of or revision to development regulations shall be consistent with and implement the comprehensive plan." (The Board references RCW 36.70A.130(1)(d), but based on the text and the context of its decision, it intended RCW 36.70A.130(1)(e).)

establishment shall be deemed illegal and shall be discontinued or terminated and subject to removal . . . ." The Board found that the Ordinance was internally inconsistent with the zoning regulation, in violation of RCW 36.70A.130(1)(e).[9] In summary, the Board concluded that the Ordinance was inconsistent with sections of the County's comprehensive plan, and, as required under RCW 36.70A.130, any land use plan and development regulations are subject to continuing review and evaluation, including consideration of critical area ordinances and population analysis, which the County did not do.

The Board concluded that the Ordinance was clearly erroneous based on the entire record and in violation of the goals and requirements of the GMA because it substantially interfered with the fulfillment of multiple GMA planning goals.

The County has argued that Ordinance 19030 does comply with the GMA, and that the order of the Board failed to apply the law and the Board misunderstood portions of the Ordinance and the legality of the existing WBDs. The County argues that the Board did not follow the plain language of the GMA and impermissibly shifted the burden of proof to the County rather than the petitioner. Essentially, the County asserts that the Board did not give the Ordinance the required deference and failed to understand several of its provisions.

---

[9] "Any amendment of or revision to a comprehensive land use plan shall conform to this chapter. Any amendment of or revision to development regulations shall be consistent with and implement the comprehensive plan."

As discussed above, the Board did give the County the required deference. Deference does not require the Board to rubber-stamp every action taken by the County, but requires the Board to look closely at the Ordinance and the requirements of the GMA and presume that the Ordinance follows those requirements unless evidence shows otherwise. Here, the evidence did show otherwise. Whether the WBDs are currently legal or illegal is irrelevant. Under either interpretation, the language of the Ordinance expanded some aspects of WBDs while placing tighter restrictions on others, and the net environmental effect of those changes on designated agricultural land should have been considered in the environmental review.

The County goes on to assert that the Board's order did not align with RCW 36.70A.302[10] because the Board failed to provide facts that supported the conclusion that the Ordinance would substantially interfere with GMA goals. The County's argument relies on analysis in *Town of Woodway v. Snohomish County*, 180 Wn.2d 165, 322 P.3d 1219 (2014), *overruled in part by Chong Yim v. City of*

---

[10] "(1) The board may determine that part or all of a comprehensive plan or development regulations are invalid if the board:
"(a) Makes a finding of noncompliance and issues an order of remand under RCW 36.70A.300;
"(b) Includes in the final order a determination, supported by findings of fact and conclusions of law, that the continued validity of part or parts of the plan or regulation would substantially interfere with the fulfillment of the goals of this chapter; and
"(c) Specifies in the final order the particular part or parts of the plan or regulation that are determined to be invalid, and the reasons for their invalidity."

*Seattle*, 194 Wn.2d 682, 451 P.3d 694 (2019), and *Davidson Serles & Associates v. Central Puget Sound Growth Management Hearings Board*, 159 Wn. App. 148, 244 P.3d 1003 (2010). The County argues that even if a potential SEPA violation exists, it is irrelevant because the Board did not properly find a GMA violation.

In *Town of Woodway*, this court stated that boards have the ability to review plans for both GMA and SEPA violations, but the boards are limited to two remedies—noncompliance or invalidity. 180 Wn.2d at 178. The *Davidson Serles & Associates* case outlined what the Board must find in order to make a determination of invalidity:

> In sum, the Board is empowered with the authority to invalidate a jurisdiction's comprehensive plan or development regulations where the Board (1) makes a finding of noncompliance, (2) remands, (3) makes a determination supported by findings and conclusions that the continued validity of the plan or regulation will *substantially interfere with the fulfillment of the goals of the GMA*, and (4) specifies the portion of the action that is invalid and explains why.

159 Wn. App. at 157.

Here, the Board specifically acknowledged what was necessary to invalidate the Ordinance.[11] The Board then comprehensively analyzed the legal requirements. First, the Board entered findings of fact detailing how the Ordinance and the County's checklist failed to comply with SEPA and GMA provisions and cited to which regulations were violated. Second, the Board remanded to the County with a

---

[11] Findings of Fact 1-12; Conclusions of Law A-D. AR at 49444-46.

schedule to come into compliance. AR at 49451-52. The Board's order detailed exactly what the County must do, including a full, environmental review.

Third, the Board provided findings and conclusions explaining how the Ordinance substantially interferes with the fulfillment of the goals of the GMA. The order specifically pointed to the goals found at RCW 36.70A.020(8), (10), and (12). Those statutory sections require the maintenance of natural resource industries and agriculture, protection of the environment including water and air quality, and ensuring that public facilities are adequately available at the time of occupancy and use.

A number of findings of fact laid out exactly why specific sections of the Ordinance and map attachments[12] were invalid. For example, the Board described that the development of rural and agricultural land with no environmental review failed to maintain the natural resource industries and failed to protect water quality. The issue of water runoff is particularly important in this area because the Sammamish River is a crucial salmon route already threatened by development. AR at 49422-23. The Board also noted that allowing large public gatherings in rural spaces that do not have on-site sewage systems did not ensure sufficient public facilities.

---

[12] Sections 12-29, 31, and map amendments No. 1 and No. 2.

The County's argument is essentially that the potential environmental impact is unknown until it occurs. But that is why the potential environmental impact is required when considering code changes, and here the County's DNS checklist did not address any potential environmental impacts and concluded no potential environmental impacts existed, violating the statutory requirements to plan. Overall, acting without *any* information on the potential environmental effects of an omnibus ordinance that affects zoning designations, types of uses, permitting thresholds, setbacks, lot sizes, paving up to 25 percent of an area for parking, facilities requirements, and business licensing requirements conflicts with the requirements to protect and enhance agriculturally significant land. RCW 36.70A.020, .060. The Board's specific findings, conclusions, and order correctly comply with the goals of the GMA.

The County also emphasizes that RCW 36.70A.177 allows the County to use innovative zoning techniques to make use of land and allows accessory uses such as the type set out in the Ordinance. However, RCW 36.70A.177 does not give counties such unlimited discretion, especially in areas identified and classified under the County's comprehensive plan.

In *King County*, 142 Wn.2d 543, we established that while counties have broad discretion to develop plans and development regulations suited to unique local circumstances, such discretion does not allow a proposed action to convert

agricultural land to uses that do not support agricultural land preservation. The GMA does not allow "innovative" techniques that convert prime agricultural soil to unrelated uses. The explicit purpose of RCW 36.70A.177 is to provide for creative alternatives that still maintain and enhance the agricultural environment. The Board correctly concluded that the Ordinance has the opposite potential effect.

The Board found that the Ordinance interfered with RCW 36.70A.177(3)(a).[13] To support this finding, the Board pointed out that the Ordinance allowed accessory uses of wine tasting and large-scale events with no adequate regulations and adequate setbacks to prevent conflicts with agricultural activities. The Ordinance also has no specific restrictions on agricultural accessory uses and activities to keep them to an appropriate size, scale, and intensity consistent with the *existing agricultural use*. RCW 36.70A.177(3)(b)(ii).

In *King County*, we noted that the GMA requires counties to "designate agricultural lands of long-term commercial significance," to "assure the conservation of agricultural lands and to assure that the use of adjacent lands does not interfere with their continued use for the production of food or agricultural products," and to "conserve agricultural land in order to maintain and enhance the agricultural industry and to discourage incompatible uses." 142 Wn.2d at 556, 557

---

[13] "Accessory uses shall be located, designed, and operated so as to not interfere with, and to support the continuation of, the overall agricultural use of the property and neighboring properties, and shall comply with the requirements of this chapter."

(emphasis removed); RCW 36.70A.020(8), .060(1), .170(1)(a). The County has the responsibility, once that designation exists, to conserve and enhance agricultural lands under the GMA. The Ordinance may well be the antithesis of that statutory requirement, particularly when no environmental review has been conducted.

The holding of *King County* supports the Board's order. In that case, we held that the County could not construct temporary soccer fields in an agricultural area because the project would result in removal of designated agricultural land from its availability for agricultural production, and, even on a temporary planned basis, we concluded that removal violated the statute. We noted that the GMA mandates conservation of limited irreplaceable agricultural resource land, and recreational facilities were not consistent with conservation. *King County*, 142 Wn.2d at 562-63. Under that case, constructing temporary grass soccer fields was not consistent with the mandates of the GMA. Applying that reasoning here, we hold that constructing permanent WBD facilities and paved parking areas cannot be consistent with the GMA.

The Board went into significant detail about GMA compliance and the provisions of the Ordinance. But the requirements of the GMA are quite clear—agricultural land must be conserved, by maintaining or enhancing the land, and by discouraging incompatible uses. The GMA does not allow the County to presume that expanding WBDs and tasting rooms on agricultural land, and expanding the

pavement, sewage, and buildings to support them, with no environmental review is an allowed accessory/compatible use. Though the County claims that its proposed accessory uses are consistent with RCW 36.70A.177, without a comprehensive SEPA review, this claim fails. A myriad of questions remains as to the agricultural use of the properties that fall under the Ordinance and the viability of the land in this designated agricultural area. Further questions remain as to the ability of the County's proposed accessory uses and how those uses actually conserve the agricultural nature of the land, as they must. The Board properly found that the Ordinance violated the requirements of the GMA.

II.    SEPA Compliance

SEPA is found in chapter 43.21C RCW, and the rules for SEPA are found in chapter 197-11 WAC. The goals of SEPA are to (1) create harmony between people and the environment, (2) prevent damage to the environment, (3) stimulate the health and welfare of humans, and (4) enrich understanding of natural resources and systems. RCW 43.21C.010. Under SEPA, an EIS is required and must be prepared for any proposals and actions with a probable, significant, adverse environmental impact. RCW 43.21C.031.[14] An environmental review is

---

[14] "(1) An environmental impact statement (the detailed statement required by RCW 43.21C.030(2)(c)) shall be prepared on proposals for legislation and other major actions having a probable significant, adverse environmental impact. The environmental impact statement may be combined with the recommendation or report on the proposal or issued as a separate document. The substantive decisions or recommendations shall be clearly identifiable in the combined

also required to be completed as early as possible in the planning process to ensure that plans reflect environmental values. WAC 197-11-055(1).

SEPA sets the guideline that agencies should include in every proposal for new legislation and major actions that significantly affect the environment, a detailed report about (1) the environmental impact, (2) any adverse environmental effects, (3) alternative options, (4) the relationship between short-term uses and long-term productivity, and (5) any irreversible commitments of resources. RCW 43.21C.030(c). The agency must consider both short- and long-term impacts, and direct and indirect impacts. WAC 197-11-060. SEPA acts as a full disclosure directive to consider any potential environmental impacts of a project.

SEPA mandates that county planning agencies make a threshold determination for any proposal that meets the definition of action. RCW 43.21C.033(1); WAC 197-11-310(1). Under SEPA, the definition of "action" covers just about everything, and within that category are project and nonproject

---

document. Actions categorically exempt under RCW 43.21C.110(1)(a) and 43.21C.450 do not require environmental review or the preparation of an environmental impact statement under this chapter.

"(2) An environmental impact statement is required to analyze only those probable adverse environmental impacts which are significant. Beneficial environmental impacts may be discussed. The responsible official shall consult with agencies and the public to identify such impacts and limit the scope of an environmental impact statement. The subjects listed in RCW 43.21C.030(2)(c) need not be treated as separate sections of an environmental impact statement. Discussions of significant short-term and long-term environmental impacts, significant irrevocable commitments of natural resources, significant alternatives including mitigation measures, and significant environmental impacts which cannot be mitigated should be consolidated or included, as applicable, in those sections of an environmental impact statement where the responsible official decides they logically belong."

actions. Nonproject actions are decisions on policies, plans or programs, such as "[t]he adoption or amendment of comprehensive land use plans or zoning ordinances." WAC 197-11-704(2)(b)(ii). A nonproject action is not fully exempt from environmental review and must still comply with SEPA, unless it falls under one of the categorical exemptions (which do not apply here). RCW 43.21C.450. SEPA allows for phased review, and a nonproject proposal or action may be approved based on an EIS assessing a broad impact, and any subsequent project actions may use that EIS in a later review, requiring that environmental review should be front loaded and forward looking. WAC 197-11-443, -060(5).

SEPA provides a checklist to assist planning agencies in making threshold determinations. WAC 197-11-315, -960. The agency must base its threshold determination on reasonably sufficient information on the environmental impact of the proposal and take additional steps if such information is not available. WAC 197-11-335. The threshold determination decides whether a proposal has a probable significant adverse impact, and, if so, will require an EIS. WAC 197-11-300(2). "A threshold determination shall not balance whether the beneficial aspects of a proposal outweigh its adverse impacts, but rather, shall consider whether a proposal has any probable significant adverse environmental impacts." WAC 197-11-330(5). The lead agency can then either issue a DNS (if no probable significant

adverse impact exists) or a determination of significance (if probable significant

adverse impact exists).[15] WAC 197-11-310(5).

A threshold determination that an EIS is not required is reviewed under the

"'clearly erroneous'" standard, and a reviewing court will overturn an agency's

DNS when "'[a]lthough there is evidence to support it, the reviewing court on the

entire evidence is left with the definite and firm conviction that a mistake has been

committed.'" *King County v. Wash. State Boundary Rev. Bd.*, 122 Wn.2d 648, 661,

860 P.2d 1024 (1993) (alteration in original) (quoting *Norway Hill Pres. & Prot.*

*Ass'n v. King County Council*, 87 Wn.2d 267, 274, 552 P.2d 674 (1976)). The

record must show that relevant environmental factors were considered in a way

that sufficiently amounts to prima facie compliance with the requirements of

SEPA. *Wild Fish Conservancy v. Dep't of Fish & Wildlife*, 198 Wn.2d 846, 867,

502 P.3d 359 (2022); *Chuckanut Conservancy v. Dep't of Nat. Res.*, 156 Wn. App.

274, 286-87, 232 P.3d 1154 (2010).

Further, we have held that proposed land-use related actions, such as zoning

ordinances, are

> not insulated from full environmental review simply because there are
> no existing specific proposals to develop the land in question or
> because there are no immediate land use changes which will flow
> from the proposed action. Instead, an EIS should be prepared where
> the responsible agency determines that significant adverse
> environmental impacts are probable following the government action.

---

[15] A threshold DNS allows the agency to avoid a full EIS.

*Wash. State Boundary*, 122 Wn.2d at 664. Thus, we must determine whether the record shows that environmental impacts are probable as a result of the Ordinance.

The first matter to resolve is which SEPA checklist this court should consider. The County produced one checklist prior to the threshold determination. AR at 29-48. After the Board determined that the Ordinance was invalid initially, the County attempted to come into compliance and completed another checklist. King County's Suppl. Br., App. E. The second checklist was not used by the County to make a threshold decision about the Ordinance because it was not produced until after the Ordinance was passed. The Court of Appeals did consider the second checklist in its analysis. The petitioners assert that the Court of Appeals erred in using the second checklist rather than the one that was actually cited by the Board and relied on for the threshold determination.

As noted above, when a Board decision is appealed, we review the Board's decision and look at the record that was before the Board. In its opinion, the Court of Appeals looked at a later version of the SEPA checklist that was not part of the DNS and not cited by the Board. We conclude that the Court of Appeals erred in considering a later checklist that was not part of the County's original DNS. Rather, we must consider the first checklist that was used in making the threshold determination and that was reviewed by the Board.

Next, we turn to the content of the SEPA checklist that was generated by the County to make the DNS. In that checklist, the County answered nearly every question under part B, "Not applicable for this nonproject action." A few answers elaborated that certain environmental elements existed, but none of the answers provided an analysis of potential impacts of the Ordinance. AR at 33-45. Part B addresses the environmental elements. While some of the answers in part B acknowledged that there may be some potential environmental impact, the checklist relied on existing laws to provide sufficient environmental protections and did not elaborate on any protections or impact mitigation provided by the Ordinance.

The Board determined that the checklist was insufficient to establish compliance with SEPA. That decision was based on a number of findings. First, the Board found that the checklist failed to address the full range of probable impacts of the future projects that the Ordinance would allow violating WAC 197-11-060(4).[16] The Board based this on its finding that the County used existing, unallowed WBDs as the baseline condition and failed to fully address the impact of

---

[16] "(c) Agencies shall carefully consider the range of probable impacts, including short-term and long-term effects. Impacts shall include those that are likely to arise or exist over the lifetime of a proposal or, depending on the particular proposal, longer.

"(d) A proposal's effects include direct and indirect impacts caused by a proposal. Impacts include those effects resulting from growth caused by a proposal, as well as the likelihood that the present proposal will serve as a precedent for future actions. For example, adoption of a zoning ordinance will encourage or tend to cause particular types of projects or extension of sewer lines would tend to encourage development in previously unsewered areas."

the new developments that would be authorized by the Ordinance. The County did not address all future project actions the proposal would allow and, in fact, did not consider impacts of *any* future actions in the SEPA checklist. Instead, the County deferred all environmental review to the individual project action stage.

Second, the Board found that the Ordinance impermissibly "balanced" the potential negative impacts of the proposal with the potential benefits, in violation of WAC 197-11-330(5).[17] The Board noted that a SEPA checklist is meant to be a full disclosure document, with enough information to inform the planning agency of all likely, significant environmental impacts of the proposed action.

Third, the Board found that the checklist violated RCW 43.21C.030(c)[18] and WAC 197-11-060(4)[19] because the checklist did not disclose the likely

---

[17] "A threshold determination shall not balance whether the beneficial aspects of a proposal outweigh its adverse impacts, but rather, shall consider whether a proposal has any probable significant adverse environmental impacts under the rules stated in this section. For example, proposals designed to improve the environment, such as sewage treatment plants or pollution control requirements, may also have significant adverse environmental impacts."

[18] "Include in every recommendation or report on proposals for legislation and other major actions significantly affecting the quality of the environment, a detailed statement by the responsible official on:

"(i) the environmental impact of the proposed action;

"(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented;

"(iii) alternatives to the proposed action;

"(iv) the relationship between local short-term uses of the environment and the maintenance and enhancement of long-term productivity; and

"(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented"

[19] "(4) Impacts.

"(a) SEPA's procedural provisions require the consideration of 'environmental' impacts (see definition of 'environment' in WAC 197-11-740 and of 'impacts' in WAC 197-11-752),

environmental impacts of establishing Demonstration Project Overlay A,

eliminating the on-site production requirement or reducing the minimum lot size in

the rural area. Fourth, the Board found that the checklist failed to consider all

reasonably foreseeable impacts of the proposed Ordinance by delaying review to

the project action stage and did not consider cumulative environmental impacts, in

violation of WAC 197-11-060 and WAC 197-11-055.[20]

The final conclusion of the Board was that the County failed to establish

prima facie showing of SEPA compliance. The order noted that the checklist was

inadequate because it did not contain reasonably sufficient information about

---

with attention to impacts that are likely, not merely speculative. (See definition of 'probable' in WAC 197-11-782 and 197-11-080 on incomplete or unavailable information.)

"(b) In assessing the significance of an impact, a lead agency shall not limit its consideration of a proposal's impacts only to those aspects within its jurisdiction, including local or state boundaries (see WAC 197-11-330(3) also).

"(c) Agencies shall carefully consider the range of probable impacts, including short-term and long-term effects. Impacts shall include those that are likely to arise or exist over the lifetime of a proposal or, depending on the particular proposal, longer.

"(d) A proposal's effects include direct and indirect impacts caused by a proposal. Impacts include those effects resulting from growth caused by a proposal, as well as the likelihood that the present proposal will serve as a precedent for future actions. For example, adoption of a zoning ordinance will encourage or tend to cause particular types of projects or extension of sewer lines would tend to encourage development in previously unsewered areas.

"(e) The range of impacts to be analyzed in an EIS (direct, indirect, and cumulative impacts, WAC 197-11-792) may be wider than the impacts for which mitigation measures are required of applicants (WAC 197-11-660). This will depend upon the specific impacts, the extent to which the adverse impacts are attributable to the applicant's proposal, and the capability of applicants or agencies to control the impacts in each situation." (Boldface omitted.)

[20] This section addresses timing: "(1) Integrating SEPA and agency activities. The SEPA process shall be integrated with agency activities at the earliest possible time to ensure that planning and decisions reflect environmental values, to avoid delays later in the process, and to seek to resolve potential problems." (Boldface omitted.)

environmental effects in this agricultural area to support the DNS, violating WAC 197-11-335. Additionally, the content of the environmental review was not aligned with SEPA's goals and policies, WAC 197-11-060, and the proposal did not include any information required by RCW 43.21C.030(c).[21] The Board noted that the Ordinance was "clearly erroneous" based on the entire record, applying the proper standard of review and deference required of them.

The Court of Appeals reversed the Board and ordered that the DNS be reinstated. It found that the Board used an inappropriate baseline in considering the effects of Ordinance 19030, reasoning that the appropriate baseline from which to gauge the impact of the Ordinance were the existing uses in the area at the time the Ordinance was enacted. It stated that the Ordinance did not legalize any previously illegal uses, and therefore it was speculative to evaluate the Ordinance based on the possibility that the existing uses could have been forced to stop operations had the Ordinance not been passed. The court also found that the County did not engage in

---

[21] "Include in every recommendation or report on proposals for legislation and other major actions significantly affecting the quality of the environment, a detailed statement by the responsible official on:
"(i) the environmental impact of the proposed action;
"(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented;
"(iii) alternatives to the proposed action;
"(iv) the relationship between local short-term uses of the environment and the maintenance and enhancement of long-term productivity; and
"(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented."

any improper balancing of impacts because there was no likelihood of the Ordinance generating new, nonspeculative adverse impacts. In doing so, the Court of Appeals disregarded the agricultural designation under the County's comprehensive plan.

The County encourages us to affirm the Court of Appeals on this basis. The County asserts that it was not required to answer the questions in part B of the SEPA checklist because it classified the Ordinance as a nonproject action. The County relies on WAC 197-11-315(1)(e), which states that an agency must use the provided SEPA checklist for a threshold determination except for nonproject proposals when the agency determines that the questions in part B do not contribute meaningfully to the analysis of the proposal, though parts A, C, and D at a minimum must still be completed.

The County's argument disregards what this court has said regarding SEPA. In *Washington State Boundary*, 122 Wn.2d 648, we said that a proposed land use action is not exempted from environmental review just because there are no current, specific development proposals or immediate land use changes that will result from the proposed action. Rather, the rule we adopted was that an EIS must be prepared by the relevant agency when the agency "determines that significant adverse environmental impacts are probable following the government action." *Wash. State Boundary*, 122 Wn.2d at 664.

In this case, the record discloses current, specific developments and land use changes that are probable to result from the proposed action. The proposed action creates opportunities for new and existing WBD businesses to open or expand operations within land classified as rural and agricultural. The fact that businesses have already been established, whether legal or illegal, is irrelevant. What controls arises from the comprehensive plan's rural and agricultural designation. Ample evidence exists in the record showing what businesses are likely to operate in this area, which is sufficient to inform an environmental review, as the changes under the Ordinance apply countywide to all rural and agricultural land. The County must consider the likely environmental impact if all the land located in the area is put to its maximum use under the new regulation because it is very probable that the land in this popular winery destination area and other areas will be used in that manner.[22] The Board expressly noted that the County must evaluate the potential impacts allowed by the changed designation where these "impacts are not merely hypothetical but can be known or are reasonably foreseeable." AR at 49412. As the Board found, "In sum, when a county amends its Comprehensive Plan or changes zoning, a detailed and comprehensive SEPA environmental review is required to

---

[22] As noted, 54 WBDs already operate, and it is entirely predictable that under the Ordinance, more will open.

understand and evaluate the impact of the change in allowable uses." AR at 49413 (emphasis removed). We agree.

We have also established that the appropriate baseline to compare the environmental impacts of the proposed action is the *condition* of the existing environment, rather than considering the current *uses* of the land. *Wild Fish Conservancy,* 198 Wn.2d at 872. The Court of Appeals in this case looked at the current *uses* of the land, the current operating WBDs, because they erroneously concluded that the Ordinance had no effect in reversing or enforcing the existing code. The Court of Appeals relied on *Quadrant* for that premise but misunderstood that case. That case held that counties and cities planning under the GMA may consider vested rights in the land when determining whether land is characterized by urban growth. *Quadrant*, 154 Wn.2d at 228. It did not say that the appropriate baseline is to consider unlicensed existing uses of the land, and the case did not look at agriculturally designated land but, instead, land designated as an urban growth area. The baseline that the Court of Appeals considered is not useful in this case because it is an ever-changing status as buildings are constructed and land is developed. This view is not consistent with the protections of agricultural land under the GMA.

The Board looked at the current *condition* of the land, noting that the land is primarily agricultural and rural in nature, and the Ordinance would have an effect

on the existing condition of the land. This comparison is consistent with our analysis in *Wild Fish Conservancy*, where we said that it is useful to establish a baseline environmental condition to compare a proposal's impact. 198 Wn.2d at 871. The designation of the land as agricultural defines the existing environmental condition.

We agree that the Board made the proper comparison between the Ordinance and the baseline condition of the environment within this rural and agricultural zone. The Ordinance allows much of the agricultural and rural land in Sammamish Valley and elsewhere in King County to serve as semiretail event space, potentially impacting the environment. While some businesses already exist and impact the condition of the land, under the Ordinance, more structures will be built, land will be paved, and water usage and sewage will inevitably increase, all having a very likely impact on the condition of the land and a negative impact on the environment. Since under the GMA conservation and enhancement of agriculturally designated land is required, and this land is agricultural and rural, the proper baseline to consider is that land designation or condition because such a designation controls the planning decisions.

The County asserts that the Ordinance changes the zoning code to enact stricter requirements and therefore does not require environmental review. But that argument misses the point of SEPA. The County disregards the language in WAC

197-11-330(5), which requires that a threshold determination may not balance the beneficial aspects of a proposal with its adverse impacts. Even where proposals are designed to in some ways improve the environment, significant adverse environmental impacts could result and must still be reviewed for what adverse impacts are likely to occur overall. The County has argued that the Ordinance will tighten the controls on WBDs and connected events. However, allowing expanded businesses and events may still impact the environment and, as such, must be reviewed for those potential adverse impacts. Potential positive impacts are irrelevant.

Importantly here, the *type* of land that is affected by the Ordinance must impact the breadth of the SEPA analysis. The land in question is mostly agricultural and is designated as such. Agricultural land that is specifically designated must be maintained and enhanced for potential future use under the GMA, even if the land is not being used for agricultural production currently. The GMA requirement ensures the land is preserved for future agricultural uses. "The County [is] required *to assure the conservation of agricultural lands and to assure that the use of adjacent lands does not interfere with their continued use for the production of food or agricultural products*." *King County*, 142 Wn.2d at 556. That agricultural designation has an effect on the SEPA review considerations for ordinances that impact such land. Any action (even creating a temporary, grass

soccer recreation field, *see King County*, 142 Wn.2d at 545) that removes potential future productivity of agricultural land may have a probable significant environmental impact.

The County argues further that the Board has the authority only to invalidate an ordinance for noncompliance with the GMA, so under its view, even if the County did fail to follow SEPA threshold determination requirements, because there is no GMA violation, the Board should not have invalidated the Ordinance. We disagree. As stated above, without full environmental review, the Ordinance does violate the GMA. Further, the Board is specifically tasked with review of SEPA compliance, as outlined in RCW 36.70A.280 and .300. To conclude that the Board may review SEPA compliance but take no action for noncompliance would disregard the statutory power designated to the Board. Under that statutory directive, the Board must follow the steps for a determination of invalidity laid out in RCW 36.70A.302, which the Board here correctly did.

Overall, we find that the Board did establish sufficient facts showing that the County failed to consider potential environmental impacts in its SEPA checklist. The Board found that the checklist did not disclose any potential environmental impacts of the Demonstration Project Overlay A, which establishes remote tasting rooms in a rural area not previously allowed. The checklist did not disclose any environmental impacts for expanding WBDs into rural, agricultural areas. The

checklist did not address likely environmental impacts of removing the on-site production requirement and replacing it with a requirement that 60 percent of the products processed on-site must be grown on-site, and the loophole it creates in not requiring that a specific amount of sales must be of products produced on-site. The checklist did not address any likely environmental impacts associated with reducing minimum lot size or with allowing more events to occur during the summer months through temporary use permits or any potential water pollution effects of these changes.

The Board concluded that it was left with the definite and firm conviction that a mistake had been committed when the County issued the DNS. We agree. Overall, the number of changes created by the Ordinance, and the complete lack of engagement with the environmental portion of the SEPA checklist by the County supports the Board's conclusion. The County must *meaningfully* engage in the SEPA process when making a threshold determination and must complete a full environmental review where significant environmental impacts are likely to occur on land designated as agricultural.

## CONCLUSION

We reverse the Court of Appeals and reinstate the Board's final decision and order.

Johnson, J.

WE CONCUR:

González, C.J.

Owens, J.

Yu, J.

Montoya-Lewis, J.

No. 102177-1

STEPHENS, J. (dissenting in part)— Land use planning in Washington takes place at the county level, and the Growth Management Hearings Board is tasked with reviewing county planning and zoning actions to ensure compliance with the Growth Management Act (GMA), ch. 36.70A RCW, and with the State Environmental Policy Act (SEPA), ch. 43.21C RCW. The Growth Management Hearings Board may invalidate a county action it finds to be in conflict with the requirements of the GMA, and it may order additional environmental review if it finds an action noncompliant with SEPA. But in fulfilling this oversight role, both under the GMA and SEPA, the Growth Management Hearings Board must afford deference to the county, presuming the validity of its actions absent a showing of clear error. Only where the factual record leaves the board with a "'firm and definite conviction that a mistake has been committed'" should it intercede, and the party challenging the action has the burden of demonstrating such error. *Lewis County v. W. Wash. Growth Mgmt. Hr'gs Bd.*, 157 Wn.2d 488, 497-98, 139 P.3d 1096 (2006) (quoting *Dep't of Ecology v. Pub. Util. Dist. No. 1 of Jefferson County*, 121 Wn.2d 179, 201, 849 P.2d 646 (1993)). This deferential standard of review requires that the board fully and accurately consider what the challenged plan or development regulation entails, as both a legal and factual matter.

Here, the Central Puget Sound Growth Management Hearings Board (Board) misinterpreted several provisions of King County Ordinance 19030 (Ordinance or Ordinance 19030). The Board also failed at times to presume the county's compliance with SEPA and the GMA absent an affirmative showing to the contrary. These errors caused the Board to erroneously invalidate the bulk of Ordinance 19030. I would largely affirm the well-reasoned opinion of the Court of Appeals, which properly construes the Ordinance and measures its impact in light of existing conditions under prior code. With one exception, discussed below, I would hold that the Ordinance complies with SEPA and the GMA, and remand to the Board for entry of a corrected order.

## DISCUSSION

This case concerns challenges to Ordinance 19030 under both SEPA and the GMA. Part I of this opinion addresses the Board's SEPA analysis. With one exception, I agree with the Court of Appeals that the Board's findings are erroneous and should be reversed. Part II of this opinion concerns the Board's GMA analysis and explains how the Board misapplied the statute and erroneously invalidated the ordinance.

I.       SEPA

SEPA is a procedural statute aimed at "injecting environmental awareness into all levels of governmental decision-making." *Columbia Riverkeeper v. Port of Vancouver USA*, 188 Wn.2d 80, 104, 392 P.3d 1025 (2017) (Stephens, J. dissenting). SEPA requires, at a minimum, that an agency's responsible official make a threshold determination as to whether an action will "[have] a probable significant, adverse environmental impact." RCW 43.21C.031, .033. This determination must be based on information reasonably sufficient to evaluate the environmental impact of the proposal and the agency must complete an environmental checklist to document its analysis. WAC 197-11-335, -315. Based on this checklist, the agency's responsible official must then issue a determination of significance or a determination of nonsignificance (DNS), as the case may be. WAC 197-11-310, -330. It is incumbent on the agency to show that "'environmental factors were considered in a manner sufficient to amount to prima facie compliance with the procedural requirements of SEPA.'" *Chuckanut Conservancy v. Dep't of Nat. Res.*, 156 Wn. App. 274, 286-87, 232 P.3d 1154 (2010) (quoting *Juanita Bay Valley Cmty. Ass'n v. City of Kirkland*, 9 Wn. App. 59, 73, 510 P.2d 1140 (1973)).

When challenged, a county's determination that a full environmental review is unnecessary—or would be better deferred to a later stage of development—should

be reversed only where the Board finds it "clearly erroneous" on the facts presented in the record. *Norway Hill Pres. & Prot. Ass'n v. King County*, 87 Wn.2d 267, 273-74, 552 P.2d 674 (1976). Generally, if the Board finds a SEPA violation, it must remand for the county to come into compliance, and, pending further environmental review, the challenged action remains in effect absent a finding of GMA invalidity. When the Board finds an action noncompliant with SEPA, and judicial review is sought, courts review the Board's legal conclusions de novo and its factual findings for substantial evidence. *Thurston County v. W. Wash. Growth Mgmt. Hr'gs Bd.*, 164 Wn.2d 329, 190 P.3d 38 (2008). A party aggrieved by an agency decision is entitled to relief if they can establish one of the grounds enumerated in the Administrative Procedure Act (APA): the relevant grounds here being that the agency erroneously interpreted or applied the law or that the agency order is not supported by substantial evidence when viewed in light of the whole record before the court. RCW 34.05.570(3)(d), (e).

King County's responsible official—Ty Peterson—was presented a checklist in which much of the impact analysis was reduced to some variation of "[n]ot applicable for this nonproject action." Admin. R. at 33-45. The county had concluded that either the Ordinance was unlikely to significantly alter the status quo or that the impacts were too speculative to meaningfully review until after specific

proposals were submitted. There is nothing inherently wrong with deferring environmental review to the project stage. Indeed, as the Board noted in its order, "project level impacts may properly be deferred to the permitting stage." Clerk's Papers (CP) at 19. However, it is not permissible to defer environmental review for "impacts that are allowed by virtue of the change in designation itself." CP at 19. In other words, "an agency may not postpone environmental analysis to a later implementation stage if the proposal would affect the environment without subsequent implementing action." *Spokane County v. E. Wash. Growth Mgmt. Hr'gs Bd.*, 176 Wn. App. 555, 579, 309 P.3d 673 (2013). The question here is whether, based on the record, Ordinance 19030 has any effects that would likely impact the environment and that should have been included in the checklist to inform Mr. Peterson's decision to issue a DNS.

The Board answered yes to this question, concluding that there were reasonably foreseeable environmental impacts that would flow directly from the Ordinance and that failure to at least consider those impacts in the checklist was clear error. Specifically, it found that (A) the county should have measured the anticipated impact of the Ordinance using a baseline condition that included no WBD uses rather than accepting existing "illegal" uses as part of the status quo, (B) the elimination of the on-site production requirement from the prior code would

"greatly facilitate the proliferation" of WBDs, (C) the demonstration project established by the Ordinance would override the requirement that 75 percent of the sites embraced by the Agricultural Production Buffer Special District Overlay (APB) be maintained as open space and would permit development previously disallowed, (D) the reduction in minimum lot sizes for WBDs in the rural area (RA) would lead to the proliferation of businesses in the RA zone, and (E) the system of temporary use permits created by the Ordinance would likely increase the frequency and intensity of events held at WBDs in the RA zone. CP at 22-32. The county assigns error to each of these findings, so I will consider them in turn. Given the deference owed to county planning and the legal framework for GMA and SEPA review, I conclude that the Board erred with respect to each finding except its analysis of section 25(E)(1) of the Ordinance.

> A. The county appropriately factored existing WBD uses into the baseline environmental condition for purposes of its threshold determination

In evaluating the likelihood and intensity of environmental impacts, it is useful for agencies to establish a "baseline" condition against which the impacts of future conditions can be predicted. *Wild Fish Conservancy v. Wash. Dep't of Fish & Wildlife*, 198 Wn.2d 846, 869, 502 P.3d 359 (2022). How to ascertain the appropriate baseline will vary depending on the facts of the case, but we recently

indicated it should consider the "*condition* of the existing environment." *Id.* at 872.

In *Wild Fish Conservancy*, we held the appropriate baseline condition for the land—

which had previously been used to farm Atlantic salmon, a use that would shortly

be disallowed—was the "existing condition of the environment of Puget Sound,

which ha[d] been subject to commercial salmonid farming for over three decades."

*Id.* We rejected the petitioner's contention that the baseline should be the condition

of Puget Sound *without* salmonid farming, instead, recognizing that the proposal

"'"must degrade the existing condition of the environment to have significant adverse

impact.'" *Id.* at 871. In other words, the agency may appropriately take the

environment as it finds it and need determine only whether its action is likely to

*further* significantly degrade the environment. Failure to improve or restore

environmental conditions is not an adverse environmental impact in itself. *Id.*

Certainly, the concerns voiced by petitioners here evoke sympathy, at least in

the abstract. If the county were to turn a blind eye to noncompliant uses that degrade

the land, and then amend its regulations to bless those same noncompliant uses, this

could effectively short-circuit SEPA review. The Board believed such was the case,

finding that Ordinance 19030 legalized existing "illegal" uses of the land that had a

negative environmental impact and that the county failed to consider the conditions

that would exist on the land had it fully enforced existing code provisions. But as

the Court of Appeals correctly pointed out, the record does not support this conclusion. On the contrary, the existing King County Code (KCC) already permitted WBD uses in the agricultural and RA zones and allowed for tasting rooms in the RA zone.[1] It does not follow that because some of those businesses may have been noncompliant with the prior code to some degree, the county could have shut them down entirely, resulting in a baseline without WBDs. Further, the licensing scheme under section 11(B) of Ordinance 19030 requires existing WBDs to either demonstrate that their business complies with prior code—in which case the environmental impact would remain constant—or that it has taken steps to comply with the expanded requirements of Ordinance 19030.

The Board misinterpreted the legal effect of Ordinance 19030 by failing to account for the full extent of WBD development already permissible under prior code. This, in turn, led the Board to the erroneous conclusion that the environmental impact to be considered was the difference between the Sammamish Valley absent any such uses and the proliferation of uses it foresaw under Ordinance 19030—a stark and erroneous comparison. The appropriate analysis, which the county

---

[1] Ordinance 14781, enacted in 2003, added "winery/brewery" as a permitted use in the A and RA zones and allowed tasting of products produced on-site. In 2013, the county enacted Ordinance 17539, adding distilleries to the list of permitted uses alongside wineries and breweries, and subject to the same development conditions.

8

followed, instead compares the potential environmental impacts of prior code—which already authorized much of what Ordinance 19030 addresses—to determine whether any aspects of Ordinance 19030 would clearly intensify the environmental impacts of WBDs in *excess* of what was previously allowable. Without a clear understanding of what was previously allowed, the Board did not reasonably afford deference to the county's determination. A discussion of the remaining SEPA findings demonstrates more specific ways the Board mischaracterized the nature of the change brought about by Ordinance 19030 and thus erroneously invalidated the Ordinance.

B. The Board erroneously interpreted Ordinance 19030 as eliminating the on-site production requirements and paving the way for "sham" WBDs to sell products produced off-site

King County's prior code allowed for the "tasting of products produced onsite." King County Ordinance 17539. Ordinance 19030 amends this language to read that "tasting and retail sales of products produced on-site may occur only as accessory to the primary winery, brewery, distillery production use and may be provided in accordance with state law." The Board interpreted the prior code as limiting tasting to only those products produced on-site and read Ordinance 19030 as instead permitting tasting and sales of beverages produced anywhere. This is a clear misreading of the Ordinance. By its express terms, Ordinance 19030

authorizes tasting and retail sales only of "products produced on-site" and further limits these activities by requiring they be subordinate to the primary winery, brewery, or distillery production use.

The majority likewise misstates the effect of Ordinance 19030 as creating a "loophole" by failing to require a specific amount of sales be from products produced on-site. Majority at 38. A proper reading of the Ordinance shows that it requires 100 percent of beverage sales be of products produced on-site. And whereas prior code did not actually define when a product could be deemed "produced on-site," Ordinance 19030 requires at least two stages of production—including crushing, fermenting, barrel or tank aging, or finishing—occur on-site, and that one of these activities be crushing, fermenting, or aging. There is nothing to suggest how this amendment is likely to lead to a proliferation in WBD facilities when, if anything, it is *more* restrictive than prior code in defining what may be sold at WBD facilities.

C. The Board erred in reading Ordinance 19030 as conflicting with county policies governing the development of residential subdivisions within agricultural production buffer districts

The Board further concluded that by establishing the demonstration project—which newly allows for "remote tasting rooms" (RTRs) on 13 parcels of land in the RA zone—the Ordinance was likely to have additional environmental impacts, especially in view of the fact these developments would be allowed within an APB

in violation of KCC 21A.38.130. This code provision dictates that for residential subdivisions locating in an APB, "[l]ots shall be clustered in accordance with K.C.C. 21A.14.040 and at least seventy-five percent of a site shall remain as open space, unless greater lot area is required by the Seattle-King County department of public health." The Board read Ordinance 19030's provisions governing the development of RTRs as "overrid[ing] existing code." CP at 24. But as the Court of Appeals pointed out, there is no conflict between the Ordinance and APB policy because, by its express terms, the policy applies only to residential subdivisions. *King County v. Friends of Sammamish Valley*, 26 Wn. App. 2d 906, 530 P.3d 1023 (2023). The Board's contrary reading is clearly erroneous.

> D. It is unclear that reducing the minimum lot size for WBD II uses would result in a net increase in parcels eligible for WBD development

The Board found that by reducing the minimum lot size for WBD uses in the RA zone from 4.5 to 2.5 acres, Ordinance 19030 "increases the number of parcels eligible for siting of WBD[s]." CP at 25. But again, the Board failed to consider the proper baseline as to how many parcels could already be developed for WBD uses and the intensity of environmental impacts reasonably anticipated from those uses. As the county points out, prior code made virtually *every* parcel in the RA zone eligible for some level of WBD development under the allowance for "home

11

industries." Per KCC 21A.30.090, home industries may be sited on parcels one acre or greater. In assessing the impact of Ordinance 19030, the county reasonably assumed that eliminating home industry WBDs while simultaneously decreasing the minimum lot requirement for some WBD uses in the RA zone to 2.5 acres would have a neutral impact on the overall intensity of development and its attendant environmental impact. While other approaches might have been taken, it was not clear error for the county to offset the newly allowed and disallowed uses in its assessment.

E. The Board failed to consider the extent to which special event permitting for WBDs was already allowed under prior code, which contained fewer express limitations on the discretion of permit issuers

The Board opined that Ordinance 19030 would newly allow the county to "exempt WBD [e]vent [c]enters from zoning restrictions," using a system of temporary use permits, thereby overriding zoning limitations on building occupancy, use of portable toilets, parking, performance stages, tents, traffic controls, and operating hours, and all without any "attempt to quantify the amount of development that will become allowable." CP at 26. The Board also stated that the Ordinance would allow WBD II and III facilities to cluster their special events in the summer months by changing the allowance from 2 per month to 24 per year, and chafed at the checklist's failure to "disclose what number of events currently occur with such

12

concentration being prohibited." CP at 26-27. The Board's analysis here is flawed

in two regards. First, the Board failed to note that temporary use permits were

already available under prior code and that prior code contained fewer express

limitations on what permit reviewers could approve.[2] Second, in assessing the

relative environmental impact of Ordinance 19030 vis-à-vis prior code, the Board

failed to make the proper comparison between the maximum use the land could be

put to under each scenario. Beyond mere surmise, the Board provided no basis for

determining whether, as a practical matter, limiting events to 2 per month would

result in fewer events per year than if WBDs could host all of them during the

summer. Given the language of the provisions, we must assume the full allotment

of events would occur under either scheme, and there is therefore no "expansion" of

the number of allowable events. At any rate, the county did not clearly err in

assessing impacts based on such an assumption.

---

[2] Previously, KCC 21A.32.100, governing temporary use permitting, provided only that a permit was required for "[a] use not otherwise permitted in the zone that can be made compatible for a period of up to sixty days a year" or the expansion of an established use that "(1) [i]s otherwise allowed in the zone; (2) [i]s not inconsistent with the original land use approval; (3) [e]xceeds the scope of the original land use approval; and (4) [c]an be made compatible with the zone for a period of up to sixty days a year." Prior code contained no clear direction on when the need for a permit would be triggered and contained no express limitations on occupancy.

However, the Board was right to call out Ordinance 19030's exemption for WBDs II and III uses in section 25(E)(1). That proviso waives the requirement that WBD II and III uses be pursuant to a temporary use permit in specific circumstances: if the WBDs were already operating under a Washington State Liquor and Cannabis Board production license before the effective date of Ordinance 19030, the parcel on which they operate is at least 8 acres, the structures used for events maintain a setback of at least 150 feet from interior property lines, the parcel is located in the RA zone, the parcel has direct access to a principal arterial or state highway, and the events not use amplified outdoor sound before 12:00 p.m. or after 8:00 p.m. If these criteria are met, the venue is free to hold as many as 96 events a year without need for any temporary use permits.

The Board found there were five parcels in the Sammamish Valley that could take advantage of this exemption and that the county made no attempt to quantify how much additional impact could be expected. CP at 27. I agree the record supports the Board's conclusion that this amendment would likely result in an appreciable uptick in events on the covered properties, and that SEPA requires something more than a cursory glance before the county could reasonably conclude the environmental impacts would be insignificant. Accordingly, I join in affirming the portion of the decision invalidating this provision.

Overall, however, the Board failed to afford proper deference to the county's assessment of environmental impacts because it conducted its review using a flawed understanding of the baseline against which to assess Ordinance 19030 and the effect of its provisions. Without taking into account the existing conditions prior to the Ordinance, the Board could not reliably identify what actually changed and whether any changes would likely result in additional environmental impacts beyond those that could be expected under prior code. This is true for all the Board findings save its analysis of the exemption for WBD II and III uses outlined in section 25(E)(1) of the Ordinance, where the negative impact is clearly shown. I would reverse the Board's findings of SEPA noncompliance except as applied to this single provision, for which I would affirm both the remand order and the order of invalidity.

I turn now to the Board's determination that the Ordinance is out of compliance with the GMA.

II. GMA

The GMA, dating to 1990, requires counties with specified populations to adopt comprehensive growth management plans. RCW 36.70A.040. Unlike SEPA, which is a procedural statute, the GMA imposes substantive limitations on the planning discretion of covered jurisdictions. Relevant here are those provisos mandating the designation and preservation of agricultural lands. Additionally, the

GMA requires that comprehensive plans be internally consistent and that development regulations be "consistent with and implement the comprehensive plan." RCW 36.70A.130(1)(e). A regulation or land use decision that fails to generally conform to the county's comprehensive plan is, by extension, a violation of the GMA and invalid. In this case, the Board found Ordinance 19030 violated the GMA provisions governing allowable accessory uses on agricultural lands, and that it further violated the GMA by internally conflicting with King County's own plan concerning agricultural production district buffer zones and policies concerning the preservation of rural land uses.

When reviewing plans and development regulations for compliance with the GMA, the Board must presume validity "unless [the Board] determines that the action by the . . . county . . . is clearly erroneous in view of the entire record before the [B]oard and in light of the goals and requirements of [the GMA]." RCW 36.70A.320 (1), (3). When a Board's final order is challenged under the APA, courts review its findings of fact for substantial evidence, and its legal conclusions de novo, although we accord substantial weight to the Board's interpretations of the GMA's requirements in view of its experience and technical expertise in this area. *Thurston County*, 164 Wn.2d at 341-42.

A. The Board erroneously read Ordinance 19030 to authorize the repurposing of prime agricultural lands in violation of RCW 36.70A.170 and RCW 36.70A.177

A mandatory element of comprehensive plans is the designation of agricultural lands of long-term commercial significance. RCW 36.70A.170. Once so designated, the county must protect these agricultural lands and ensure that the uses of adjacent lands do not interfere with their continued viability as farmland. RCW 36.70A.067. While the GMA permits counties to use "innovative zoning techniques" to encourage the economy in agricultural areas, their discretion is constrained by the mandate to reserve prime agricultural soils for agricultural uses. RCW 36.70A.177; *King County v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 142 Wn.2d 543, 14 P.3d (2000). To that end, RCW 36.70A.177 places specific limitations on accessory uses in agricultural zones. If the accessory use is nonagricultural—for example, developing new buildings, parking, or supportive uses—such use must be designed and operated in a manner that does not interfere with the overall agricultural use of the property and neighboring properties; specifically, nonagricultural uses may not be located outside the general area already developed, and they may not convert more than one acre of agricultural land. RCW 36.70A.177(3)(a), (b)(ii). The GMA advises counties to limit accessory uses to portions of the land with poor soils or that are otherwise unsuitable for agriculture.

17

RCW 36.70A.177(1). If the accessory use is agricultural, it must be designed and operated in harmony with the agricultural uses of the property, although the GMA imposes no quantitative spatial limitations on such uses. RCW 36.70A.177(3)(b)(i).

The Sammamish Valley Agricultural Production District is designated agricultural land. Unless and until the county redesignates this area, the primary use must be agricultural. RCW 36.70A.030(3), .060. The Board believed Ordinance 19030 stood at odds with this requirement, finding it thwarts the conservation of productive agricultural land in violation of RCW 36.70A.060(1)(a); fails to restrict agricultural accessory uses to those that are consistent with the size, scale, and intensity of existing agricultural uses of the property in violation of RCW 36.70A.177(3)(b)(ii); allows the conversion of agriculturally viable land to incompatible uses in violation of RCW 36.70A.177(3)(b)(ii); and sanctions events that are likely to interfere with the continued agricultural uses of WBD properties and neighboring lands in violation of RCW 36.70A.177(3)(a), RCW 36.70A.070(5)(c)(v), and RCW 36.70A.060(1)(a). This was error because these conclusions lack support in the record.

To start, the Board's order is unduly skeptical—mocking, even—of the county's argument that wine making—and by extension, wine tasting—could be considered an agricultural accessory use, retorting that "[u]nder this definition,

consuming a hamburger at a fast-food tasting room is an agriculturally-related experience if some portion of the meat, lettuce, tomato or other ingredient are produced onsite." CP at 37. This ignores that viticulture plainly *is* agriculture, and that the on-site production requirement, paired with the requirement that 60 percent of inputs be grown on-site, means that over half the WBDs sales must be derived from produce—for example, grapes—grown on the property. RCW 36.70A.030(6) ("'Agricultural land' means land primarily devoted to the commercial production of . . . viticultural . . . products.") To the extent the order acknowledged the Ordinance's restrictions, it dismissed the 60 percent threshold as sufficient for GMA compliance on the ground that "[the county] cites no statute that allows [it] to establish that a use is accessory by setting a bright-line threshold of onsite production or manufacturing." CP at 39. This approach unduly restricts planning discretion and turns the standard of review on its head, requiring that the county affirmatively prove GMA compliance rather than making the petitioners prove noncompliance.

The Board also found the Ordinance would increase the amount of agricultural land available for development, both in the quantity of eligible parcels and the portions of which such lands could be converted to buildings, parking, or other accessory uses. As to the quantity of eligible parcels, the Board again credited the petitioners' claim that reducing the minimum acreage to site a WBD II in the RA

19

zone from 4.5 to 2.5 acres would increase the number of WBDs in the area and increase the chance that those uses could conflict with neighboring farms in the A zone. But as discussed above, this concern is not substantiated in the record, the Board having failed to account for the number of parcels already eligible for WBD development under prior code.

At a more granular level, the Board was concerned that by instructing WBDs in the A zone to site their nonagricultural accessory structures on portions of the land "'without prime agricultural soils,'" the Ordinance, by negative implication, encourages them to build on soils that, while not "prime," are still viable farmland. CP at 37 (quoting Ordinance 19030). The Court of Appeals dismissed this concern, explaining that in applying Ordinance 19030, "the County must follow section .177, it may permit WBDs in agricultural lands only when the primary use on site is growing crops or raising livestock, and it may permit WBD facilities to be sited only on portions of agricultural land unsuitable for agricultural purposes." *Friends of Sammamish Valley*, 26 Wn. App. 2d at 932-33. Neither interpretation is entirely correct, in my view.

RCW 36.70A.177 states that nonagricultural accessory uses shall be confined to those portions of the land "already developed for buildings and residential uses and shall not otherwise convert more than one acre of agricultural land to

20

nonagricultural uses." This means the accessory structures—whether buildings, parking, or supportive uses—must be clustered near existing development. Of course, this might mean that viable agricultural land directly abutting existing buildings will be converted, but in no case more than one acre. Ordinance 19030 could be read to conflict with this, at least insofar as it suggests development may occur *either* on land within the already developed portion of agricultural lands *or* on lands without prime soils, whether clustered near existing development or not. But, this reading does not follow if there is a way to harmonize these provisions. *Associated Gen. Contractors of Wash. v. State*, 2 Wn.3d 846, 864, 544 P.3d 486 (2024) ("we attempt to harmonize statutes even if they are not completely ambiguous"). And indeed, they can be harmonized: where a portion of the land has already been developed for buildings and residential uses, nonagricultural uses must be sited in this general area and shall not convert more than one acre of agricultural land. If, however, the land has not previously been developed, a nonagricultural accessory use must be confined to lands without prime soils and again may not convert more than one acre of agricultural land. Further, all accessory uses must be designed and operated "so as to not interfere with, and to support the continuation of, the overall agricultural use of the property and neighboring properties." RCW 36.70A.177(3)(a).

Lastly, there are insufficient findings to support the Board's conclusion that events of the size and frequency permitted by the Ordinance, without additional setback requirements, would violate the GMA by interfering with agricultural uses of neighboring properties. The Board failed to presume such uses are GMA-compliant and require a clear showing to the contrary. Moreover, as the Court of Appeals noted, the Board "overlook[ed] that temporary use permits are subject to the County's discretion to impose limitations to avoid the conflicts the Board fears." *Friends of Sammamish Valley*, 26 Wn. App. 2d at 936. The Board's concerns seem more focused on the county's ability or willingness to diligently enforce its code provisions than on the express provisions of the Ordinance being challenged. Applying the required presumption that the county will enforce the new code, there is no basis for the Board's finding of noncompliance with the GMA.

>  B. Ordinance 19030 does not fail to generally conform with the county's comprehensive plan and policies

Finally, the Board's conclusion that Ordinance 19030 conflicts with the county's own comprehensive plan and policies is unsupportable. RCW 36.70A.130(1)(e) requires that "[a]ny amendment of or revision to development regulations shall be consistent with and implement the comprehensive plan." The Board found several aspects of Ordinance 19030 to conflict with King County's

comprehensive plan (KCCP) and concluded they were invalid under the GMA.

Specifically, it found Ordinance 19030 failed to conform with KCC 21A.38.130

(Special district overlay – agricultural production buffer) and KCC 21A.32.040

(Nonconformance – abatement of illegal use, structure or development).[3]  The first

finding is plainly unsupported, as explained above: the Board erred in concluding

the demonstration project violated the county's APB policy SO-120 because that

provision deals solely with the development of *residential subdivisions* in APB

zones.  The Court of Appeals correctly recognized that "Ordinance 19030 does not

authorize any 'residential subdivisions' and does not authorize any use that would

not still be subject to SO-120."  *Friends of Sammamish Valley*, 26 Wn. App. 2d at

939.

The Board also found the demonstration project violated KCC 21A.32.040,

which states:

> Any use, structure or other site improvement not established in
> compliance with use and development standards in effect at the time of
> establishment shall be deemed illegal and shall be discontinued or
> terminated and subject to removal pursuant to the provisions of K.C.C.
> Title 23.

---

[3] The petitioners also challenged Ordinance 19030 as inconsistent with KCCP farmland
and environmental policies but the board found the matter was not ripe for review "until
the County has remedied the areas of SEPA and GMA noncompliance already identified."
CP at 42.

The Board believed existing WBD uses within the demonstration project zone were "apparently unlawful" and would be subject to termination under this code provision, and that by "legalizing" these uses, Ordinance 19030 frustrates the policy of KCC 21A.32 .040. CP at 48-49. But again, this conclusion rests on the faulty premise that the uses were, in fact, "illegal" and terminable through code enforcement. This conclusion is not supported by substantial evidence, as there is no showing that enforcement actions would have succeeded in shuttering any existing WBDs in the Sammamish Valley.

In sum, the Board erred in finding Ordinance 19030 violates the GMA because it misconstrued key provisions and erroneously put the burden on the county instead of requiring the Ordinance challengers to prove noncompliance. The Board's finding that Ordinance 19030 would lead to a proliferation of WBD developments in excess of what was already permissible requires conjecture and is unsupported by the record. Further, the Board failed to accord section 18(B)(3)(g) of the Ordinance a reasonable construction that would avoid conflict with RCW 36.70A.177(3)(b)(ii), as required by settled rules of statutory construction. It also erred in concluding that Ordinance 19030 conflicts with KCC 21A.38.130, as that provision is plainly inapplicable to the type of development contemplated by the challenged Ordinance. And finally, the Board's conclusion that KCC 21A.32.040

24

required the county to seek the abatement of existing WBD uses rests on the faulty premise—unsupported by the record—that those uses were illegal under the prior code. The Court of Appeals properly reversed the Board's finding of noncompliance with the GMA, and so would I.

## CONCLUSION

The Board's SEPA and GMA analyses suffer from a fundamental misunderstanding of what Ordinance 19030 permits, how it differs from prior code, and its compatibility with related provisions of the GMA and the county code. At times, the errors arise from a misreading of the Ordinance itself or relevant portions of SEPA and the GMA. These are legal errors subject to reversal under RCW 34.05.570(3)(d). In addition, key factual findings are unsupported by sufficient evidence that, coupled with the Board's failure at times to presume the county's compliance absent a showing to the contrary, undercuts the Board's ultimate determination of SEPA and GMA noncompliance and constitutes both a legal and factual error subject to reversal under RCW 34.05.570(3)(d) and (e). I would affirm the Court of Appeals and reverse the Board's final order—except as to that portion of its decision invalidating section 25(E)(1) of the Ordinance for noncompliance with SEPA.

_____
Stephens, J.

_____
Madsen, J.

_____
Gordon McCloud, J.

_____
Whitener, J.